IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SCOTT TOOLEY | ) | CASE NO. 06 0306 CKK |
| Plaintiff, | ) | |
| v. | ) | |
| PRESIDENT GEORGE W. BUSH, ALBERTO GONZALES et al. | ) | |
| Defendants. | ) | |

AFFIDAVIT

I, Scott Thomas Franklin Tooley, having reached the age of majority with capacity, do hereby swear as follows:

1. I am a native of Nebraska and my wife and I reside in Louisville, Kentucky; and I have personal knowledge of the facts stated in this affidavit.

2. I have a Bachelor of Science degree in International Business and a Juris Doctor degree from Regent University School of Law. Prior to attending law school, I worked on Capitol Hill as the Systems Administrator for former Congressman and current Chairman of the Securities and Exchange Commission (SEC), Christopher Cox. My duties included the management of technology, including the computer networks of both the Congressman's office and the House Policy Committee. Congressman Cox, prior to assuming his current position of Chairman of the SEC, was the Chairman of the House Policy Committee.

3. In or around the Spring of 2002, while on a short break from law school, my wife and I wanted to visit both her family in Louisville, Kentucky and my family in Lincoln, Nebraska. When we got to her family's house in Louisville, I called Southwest Airlines (SWA) to purchase airline tickets to visit my family in Lincoln. After I provided all of my information, including my full name, address, and credit card number, I was asked if I had any "comments, questions, or suggestions for SWA."

4. I responded that as a traveling member of the public, I would like 100 percent of everything that goes into the airplane, including cargo, to be fully screened.

5. To my disbelief, I was asked why such a course of action would be necessary. I patiently responded that without proper security, the traveling public, including frequent flyers like myself, was less safe due to the potential that those who wanted to harm American citizens could put a bomb on a plane.

6. My reasonable suggestion to improve airline security was made with all of the following reasons in mind: First, my wife, family, and I have a self-interest, in that we are members of the traveling public, routinely fly SWA and want to be safe. Second, due to my business and public policy experience and familiarity of airline industry, I am aware that SWA's corporate culture is unique and distinct from the rest of the airline industry. SWA, at least under former CEO, Herb Kelleher, had a reputation for routinely soliciting and acting upon suggestions from all levels of the organization. In light of this, it was quite reasonable for me to think that my suggestion would make a positive difference. Third, while everyone, and rightfully so, was

emphasizing the need to seal cockpit doors and add air marshals, I believed that addressing these issues would provide only a marginal increase in safety if the loophole of unchecked cargo was left unaddressed.

7. After making these reasonable suggestions to Southwest, the SWA employee I was speaking to became alarmed and without listening to me repeatedly said, "you said the 'b' word, you said the 'b' word," ('b' for bomb) and at this point I could not believe what was transpiring and I tried to interject by saying, "ma'am, you're not listening to me, you're not understanding what I am saying;" but, before I could finish she put me on hold. I waited for twenty (20) minutes on hold even though I had already given this SWA employee all of my information and then hung up, knowing that SWA had my contact information.

8. Thereafter, I began to notice intermittent phone troubles and "clicking" noises on my home telephone. As a result of knowledge I gained on Capitol Hill, I understand that these are the signs that may be evident when one has been wiretapped.

9. Moreover, from my experience on Capitol Hill I am aware that wiretaps are pernicious and insidious because, as long as the phone line is plugged into the wall in one's home, those listening to the wiretaps can hear anything that goes on in the home.

10. The surveillance came at a time when the agencies were in a heightened security mode and resulted in a direct response to my comments to SWA. Because my comments were apparently misperceived by the SWA employee,

and the agencies were hyper-sensitive to threats to airline security, I have reason to believe that the surveillance that I have witnessed and the signs of wiretapping I have noticed resulted from my comments to SWA. Indeed, prior to my comments to SWA I had no trouble traveling or with my telephones.

11. My family and I have also noticed the problematic telephone connections.

12. Since I became aware of the surveillance, the government has admitted to instituting secret warrant less wiretaps on United States citizens.

13. My belief that my telephone communications are under surveillance is corroborated by the fact that since making my comments to SWA, I have also been subject to detention and strict search whenever I travel by air.

14. For example, in July 2004, Defendants caused me to be subjected to a degrading and unreasonable search at Omaha's Eppley Airfield, where a TSA officer pulled me aside, after my name had been broadcast over the PA system as one who needed further screening; and the TSA officer, in full view of my fellow passengers who were boarding the plane, asked me to expose the area above my groin where I was subjected to a backhanded pat-down.

15. These detentions and strict searches have occurred every time that I have traveled prior to filing this suit.

16. On another trip, in March of 2006, I have reason to believe Defendants subjected me to both physical monitoring and roving wiretaps on my trip to Ft. Worth, Texas for my brother's wedding and at the former Texas Hotel in Ft. Worth, where the wedding party stayed.

17. Additionally, I have reason to believe that in July 2004, Defendants wiretapped international phone calls that were made to and from my mother's house where I was visiting my mother for the week, and in 2006, Defendants wiretapped phone calls I placed to and received from my mom in France via my home telephone.

18. In 2004 through the present, I have routinely and specifically enumerated to my father, Pastor Ted Haggard, and other family members the serious nature of various Administration actions that are in no way flattering to the Administration.

19. Subsequent to these comments, in March of 2005, when President Bush visited Louisville – the week before and the week of Mr. Bush's visit – an officer in a Ford Crown Victoria sat out in front of my home for approximately six (6) hours a day, as a threat of recrimination or persecution of political speech that serves as a direct injury to the exercise of my First Amendment Free Speech rights.

20. All of these events support the fact that I am under surveillance.

21. The likelihood that my communications are being monitored prevents me from freely communicating via telephone and by electronic means with my family, my attorneys and my former colleagues. Since I have been detained and subject to strict searches at airports my reasonable belief that I am subject to surveillance was heightened. Moreover after learning of the National Security Agency's (presumably other agencies), illegal secret wiretap program through the news media, I have further curtailed my telephone conversations

and use of electronic correspondence. My comments to SWA were misconstrued and reported as a potential threat to aviation. Though I have always been active in political matters, because of the likelihood that I am under surveillance, I have stopped freely conversing with friends and family regarding political matters.

22. Defendants have caused me economic loss due to, among other economic damages, wiretapping and monitoring my place of employment thereby causing so much emotional and physical stress that I was fired from my job.

23. As a result of the Defendants' wiretapping, my ability to communicate with counsel has been chilled. I have reason to believe that Defendants have violated my attorney-client privilege, thereby necessitating travel and other economic expenses, that otherwise would not have been necessary had Defendants not shown a complete disregard for my Constitutional Rights.

24. As a result, I have reason to believe that Defendants have monitored events and conversations internal to my home thereby causing me to suffer a complete and total loss of my fundamental right to privacy and the sanctity of the home.

25. Defendants' surveillance has caused me loss of consortium in that my wife has moved out, and since 2005, she has declined a normal marital relationship as a result of her stated desire to not contribute to the voyeurism of Defendants' monitoring.

26. Defendants have caused me to suffer a complete and total loss of my fundamental right to privacy by instituting continuous and perpetual wiretaps on my home; as well as, roving wiretaps when I visit family and friends.

27. Defendants have caused me to suffer a palpable loss of my First Amendment Free Speech rights with my former employer, prospective employers, academic institutions, and other friends/colleagues of upstanding character.

28. Defendants have also egregiously flouted FOIA law in that Defendants continue to refuse me access to my information.

29. I have reason to believe that Defendants and their agents have engaged in and are engaging in other acts which have harmed my family and me.

FURTHER AFFIANT SAYETH NOT.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 1, 2006.

*Scott Tooley*
Scott Thomas Franklin Tooley