UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SCOTT TOOLEY,

    Plaintiff,

     v.

PRESIDENT GEORGE W. BUSH, *et al.*,

    Defendants.

Civil Action No. 06-306 (CKK)

**MEMORANDUM OPINION**
(December 21, 2006)

Plaintiff Scott Tooley has brought a somewhat opaque four-count Complaint before this

Court.  As initially brought, Plaintiff's Complaint appeared to assert three claims, Count I

(Constitutional Tort - Fourth Amendment Violation); Count II (Constitutional Tort - Right to

Privacy Violation); and Count III (First Amendment Violations), against a total of six defendants

– President George W. Bush, Vice President Richard B. Cheney, Attorney General Alberto

Gonzales, Secretary of the Department of Homeland Security Michael Chertoff, Administrator of

the Transportation Security Administration Edmund ("Kip") Hawley, and former head of the

National Security Agency, General Michael Hayden.  Counts I, II and III of Plaintiff's Complaint

are asserted against President Bush, Vice President Cheney, and General Hayden solely in their

individual capacities, while the same claims are asserted against Attorney General Gonzales,

Secretary Chertoff, and Administrator Hawley in both their individual and official capacities.  In

addition, Count IV of Plaintiff's Complaint (Declaratory Judgment: FOIA Requests) seeks

declaratory judgment against Attorney General Gonzales, Secretary Chertoff, and Administrator

Hawley in their official capacities, based on Freedom of Information Act ("FOIA") requests filed

with these defendants' respective agencies.

On November 30, 2006, the Court issued an Order pursuant to Federal Rule of Civil Procedure 4(m) requiring Plaintiff to inform the Court as to whether he had served any of the six named defendants in their individual capacities. In response, on December 15, 2006, Plaintiff filed a Notice of Voluntary Dismissal Without Prejudice, indicating that he had decided not to proceed with claims against any defendants in their individual capacities at this time, and was instead voluntarily dismissing this action against all defendants in their individual capacities. *See* Pl.'s Resp. to Rule 4(m) Order and Notice of Voluntary Dismissal Without Prejudice as to Individual Defendants. As such, the only remaining defendants to this action are Attorney General Gonzales, Secretary Chertoff, and Administrator Hawley (collectively "Defendants"), who are sued, solely in their official capacities, on all four Counts of Plaintiff's Complaint.[1] Presently before the Court is Defendants' motion for summary judgment as to Plaintiff's FOIA Count, and to dismiss Plaintiff's other three Counts pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of jurisdiction. Upon a searching review of the pleadings filed by Defendants and Plaintiff, the attached memoranda, declarations, and exhibits, and the relevant case law, the Court shall grant Defendants' motion for summary judgment as to Count IV of Plaintiff's Complaint, and shall grant the Defendants' motion to dismiss as to Counts I, II, and III of Plaintiff's Complaint.

---

[1] The Court notes that Defendants' Motion and supporting Memoranda indicate that they are brought on behalf of Attorney General Gonzales, Secretary Chertoff, and Administrator Hawley, solely in their official capacities, and as such describe them as the "Official Capacity Defendants." However, in light of Plaintiff's December 15, 2006 voluntary dismissal as to all individual capacity defendants, the Court shall refer to Attorney General Gonzales, Secretary Chertoff, and Administrator Hawley collectively as "Defendants."

# I: BACKGROUND

A. *Events Leading Up to Plaintiff's Filing of His FOIA Request*

Plaintiff, Scott Tooley, was born in Nebraska and currently resides in Louisville, Kentucky. Tooley Aff. ¶¶ 1-2. Plaintiff holds a Bachelor of Science degree, as well as a Juris Doctor degree, and was previously employed on Capitol Hill as the Systems Administrator for former Congressman and current Chairman of the Securities and Exchange Commission, Christopher Cox. *Id.* ¶ 2. During the Spring of 2002, Plaintiff telephoned Southwest Airlines ("Southwest") to purchase airline tickets. Compl. ¶ 18. After providing his name, address, and credit card number, Plaintiff was asked whether he had any "comments, questions, or suggestions for Southwest Airlines." *Id.* In response to this question, Plaintiff stated that as a member of the traveling public, he would like "100 percent of everything that goes into the airplane, including cargo, to be fully screened." Tooley Aff. ¶ 4; Compl. ¶ 19. Plaintiff was asked why such a course of action was necessary and responded that the traveling public, including Plaintiff himself, "was less safe due to the potential that those who wish to harm American citizens could put a bomb on a plane." Tooley Aff. ¶ 5; Compl. ¶ 20.

Plaintiff alleges that thereafter – specifically in the Fall of 2003 – he began to notice what he describes as problematic phone connections, including "telltale" intermittent clicking noises, which continued through the filing of his Complaint. Compl. ¶ 21. Plaintiff alleges "upon information and belief" that his telephone problems are caused by illegal wiretaps, which were placed in response to the comments Plaintiff made while booking his flight with Southwest Airlines. *Id.* Indeed, Plaintiff alleges (also upon information and belief) roving wiretaps were

3

placed on "his residential landline phone; his landline phone at his former Virginia Beach residence; his cellular phone; his wife's cellular phone; his father's phone; his brother's phone; his sister's phone; his in-laws' phone; and his family's phone in Lincoln, Nebraska where relatives from France made calls from France to the home, where [Plaintiff] was visiting his mother for the week." *Id.* ¶ 22.

Plaintiff's Complaint states that "Defendant Bush has admitted that, on numerous occasions since 2001, he ordered wiretaps and other domestic surveillance on American citizens . . . " and alleges upon "information and belief [that] Defendant Cheney also ordered the wiretaps and other domestic surveillance on American Citizens." *Id.* ¶ 38.  Plaintiff states that "[u]pon information and belief, those wiretaps have been ordered without the issuance of a warrant by a court of appropriate jurisdiction . . . ," *id.* ¶ 39, and that "Defendant Bush's eavesdropping order also did not fall within any legislative exception to established legal procedure," *id.* ¶ 42. Plaintiff alleges that "Defendants jointly and severally conceived, ordered, and implemented the illegal wiretapping scheme," Compl. ¶ 45, and that "[u]pon information and belief, [Plaintiff] is one of the victims of Defendants' highly secret and illegal wiretapping scheme," *id.* ¶ 47.

In addition to alleging that he has been the subject of wiretaps, upon information and belief, Plaintiff further alleges that his vehicle and his wife's vehicle have both been "illegally subjected to permanent Radio Frequency Identification Tags ("RFIT") that monitor their vehicle movements." *Id.* ¶ 23.  Plaintiff's Complaint alleges that when Plaintiff travels by airplane, he is improperly detained and subject to a strict search "without any probable cause." *Id.* ¶ 24.  In his Affidavit, submitted in support of his Opposition to Defendant's motion to dismiss and for summary judgment, Plaintiff provides further detail, averring that in July 2004 he was subjected

to a "degrading and unreasonable search" at Omaha, Nebraska's Eppley Airfield, in which his name was broadcast over the PA system as someone who needed further screening, and a TSA officer thereafter pulled him aside and, in full view of Plaintiff's fellow passengers, asked Plaintiff to expose the area above his groin and subjected Plaintiff to a backhanded pat-down. Tooley Aff. ¶ 14.  Plaintiff states that these detentions and strict searches have occurred every time he traveled prior to filing this suit.  *Id.* ¶ 15.

Plaintiff's Affidavit adds further allegations not included in Plaintiff's Complaint, specifically that in March 2005, during the week preceding and the week of a visit by President Bush to Louisville, Kentucky, "an officer in a Ford Crown Victoria sat out in front of [Plaintiff's] home for approximately six (6) hours a day.  *Id.* ¶ 19.  Plaintiff also alleges in his Affidavit that in March 2006, he was subjected to physical monitoring and roving wiretaps during a trip to Fort Worth, Texas for his brother's wedding.  *Id.* ¶ 16.  Moreover, Plaintiff's Complaint and Affidavit state that he believes that "he has been placed on one or more terrorist watch lists and is being illegally monitored by Defendants" as a result of his comments to the Southwest ticketing agent. Compl. ¶ 25; Tooley Aff. ¶ 13.

B.    *Plaintiff Files His FOIA Request*

In an effort to obtain information concerning what he perceives as improper governmental surveillance, on October 3, 2005, Plaintiff submitted requests under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 522, to the Department of Justice ("DOJ"), the Department of Homeland Security ("DHS"), and the Transportation Security Administration ("TSA").  Compl. ¶¶ 26-27; Off. Capacity Defs.' Stmt. of Mat. Facts as to Which There is No Genuine Issue (hereinafter "Defs.' Stmt. of Mat. Facts") ¶ 1.  Plaintiff's FOIA requests sought "all filings,

correspondence, memoranda, documents, reports, records, statements, audits, lists of names,

applications, diskettes, letters, expense logs and receipts, calendar or diary logs, facsimile logs,

telephone records, call sheets, tape records [sic], video recordings, notes, examinations, and/or

referenced opinions, folders, files, books, manuals, pamphlets, forms, drawings, charts,

photographs, electronic mail, and any other documents or things that refer to . . . Scott Tooley."

Defs.' Stmt. of Mat. Facts ¶ 2 (citing Hardy Decl., Ex. A at 2-3 (10/3/05 FOIA Request to DOJ);

Kendrick Decl., Att. 1 at 1-2 (10/3/05 FOIA Request to DHS); and Pavlick Decl., Ex. A at 2-3

(10/3/05 FOIA Request to TSA)).

### 1.    Plaintiff's FOIA Request to DOJ

Plaintiff addressed his FOIA request to DOJ to the FOIA/PA Referral Unit of the Justice

Management Division ("JMD"), Defs.' Stmt. of Mat. Facts; Defs.' Mot. to Dismiss/Summ. J.,

Ex. A (5/1/06 Decl. of David M. Hardy) (hereinafter "Hardy Decl."), Ex. A at 2-3 (10/3/05 FOIA

Request to DOJ), which routed Plaintiff's FOIA request to three components of DOJ: the Federal

Bureau of Investigation ("FBI"); the Executive Office of United States Attorneys ("EOUSA");

and DOJ's Criminal Division, *see id.* at 1 (JMD Routing Slip).

### a.    The FBI

The FBI received Plaintiff's FOIA request from JMD on October 25, 2005.  Hardy Decl.

¶ 5.  Thereafter, the FBI searched for records potentially responsive to Plaintiff's FOIA request

by searching its Central Records System ("CRS").  Defs.' Stmt. of Mat. Facts ¶ 8 ; Hardy Decl. ¶

19.  The CRS is the system by which the FBI maintains all information acquired in the course of

fulfilling its law enforcement responsibilities, including "administration, applicant, criminal,

personnel, and other files compiled for law enforcement purposes, arranged by subject matter."

Defs.' Stmt. of Mat. Facts ¶ 9; Hardy Decl. ¶ 8.  The CRS is accessed through the General

Indices, which includes entries, arranged in alphabetical order, that fall into two categories: (a)

"main" entries, which carry names corresponding with a subject of a file contained in the CRS;

and (b) "reference" entries, which are mentions or references to an individual or organization

contained in documents located in another "main" entry.  Defs.' Stmt. of Mat. Facts ¶¶ 10-11;

Hardy Decl. ¶¶ 9-10, 14.  The FBI searched the CRS General Indices for Plaintiff's name, using

fifteen different combinations of his first, middle, and last names, as well as his date of birth and

Social Security number.  Defs.' Stmt. of Mat. Facts ¶ 15; Hardy Decl. ¶ 19.  This search failed to

locate any main investigatory files responsive to Plaintiff's FOIA request at FBI headquarters.

Defs.' Stmt. of Mat. Facts ¶ 16; Hardy Decl. ¶ 19.

          In a letter dated October 28, 2005, the FBI notified Plaintiff that its search of the CRS at

FBI headquarters had located no documents responsive to Plaintiff's FOIA request, and that

Plaintiff could appeal the FBI's "no records" response in writing to the DOJ's Office of

Information and Privacy within sixty (60) days.  Defs.' Stmt. of Mat. Facts ¶¶ 17-18; Hardy Decl.

¶ 6; Hardy Decl., Ex. B (10/28/05 letter from D. Hardy to L. Klayman).  As of March 15, 2006,

DOJ had no record of receiving an administrative appeal from Plaintiff with regard to the FBI's

October 28, 2005 "no records" response.  Defs.' Stmt. of Mat. Facts ¶ 24; Hardy Decl. ¶ 7.

Nevertheless, upon receiving Plaintiff's Complaint in this litigation, the FBI opted to a conduct a

second search, this time searching the CRS for cross-references.  Defs.' Stmt. of Mat. Facts ¶ 19;

Hardy Decl. ¶ 20.  This second search also failed to locate any main files or cross-references

responsive to Plaintiff's FOIA request at FBI headquarters.  Defs.' Stmt. of Mat. Facts ¶ 20;

Hardy Decl. ¶ 20.  In addition, after receiving Plaintiff's Complaint, the FBI conducted a search

7

of its Electronic Surveillance ("ELSUR") indices, which are a separate system of records from

the CRS containing information on individuals who are or were (1) targets of direct surveillance;

(2) participants in monitored conversations; or (3) owners, leasers, or licensors of premises where

the FBI conducted electronic surveillance.  Defs.' Stmt. of Mat. Facts ¶¶ 21-22; Hardy Decl. ¶¶

16, 20.  The FBI's search of the ELSUR indices also failed to locate any records responsive to

Plaintiff's FOIA request.  Defs.' Stmt. of Mat. Facts ¶ 23; Hardy Decl. ¶ 20.

> ### b.    EOUSA

EOUSA received Plaintiff's FOIA request from JMD on October 26, 2005.  Defs.' Stmt.

of Mat. Facts ¶ 25; Mot. of the Off. Capacity Defs. to Dismiss and for Summ. J. (hereinafter

"Defs.' Mot. to Dismiss/Summ. J."), Ex. B (4/25/06 Decl. of Anthony J. Ciccone) (hereinafter

"Ciccone Decl.") ¶ 4; Ciccone Decl., Ex. 1 (10/25/05 JMD Routing Slip).  By letter dated

November 8, 2005, EOUSA informed Plaintiff that it had received his FOIA request, and advised

Plaintiff that "[s]ince the files . . . of United States Attorneys are located in more than 100

separate offices throughout the country, we ask that you identify the specific U.S. Attorney's

office(s) where you believe the requested records exist.  This would primarily be the district(s) in

which prosecution or litigation occurred . . . .  Once you have corrected the above deficiencies,

please submit a new request for the documents."  Defs.' Stmt. of Mat. Facts ¶ 28; Ciccone Decl.

¶ 12 & Ex.3 (11/8/05 letter from M. O'Rourke to L. Klayman) (emphasis in original).  EOUSA's

request for clarification was made pursuant to DOJ regulation, 28 C.F.R. § 16.3(b), which states

that "[i]f a component determines that your request does not reasonably describe records, it shall

tell you . . . so that you may modify it to meet the requirements of this section."  Defs.' Stmt. of

Mat. Facts ¶ 26; Ciccone Decl. ¶ 10.  EOUSA's November 8, 2005 letter also informed Plaintiff

that EOUSA considered the letter to be a final determination and that Plaintiff could appeal

EOUSA's determination in writing within sixty (60) days to the DOJ's Office of Information and

Privacy.  Defs.' Stmt. of Mat. Facts ¶ 29; Ciccone Decl., Ex. 3 (11/8/05 letter from M. O'Rourke

to L. Klayman).  EOUSA has not received either a response to its deficiency notice or a

superseding request from Plaintiff, nor does EOUSA have a record that Plaintiff filed an

administrative appeal within 60 days of the November 8, 2005 deficiency notice.  Defs.' Stmt of

Mat. Facts ¶¶ 30-31; Ciccone Decl. ¶¶ 13-14.

c.     <em>DOJ Criminal Division</em>

JMD referred Plaintiff's FOIA request to the DOJ Criminal Division on October 25,

2005.  Defs.' Stmt. of Mat. Facts ¶ 32; Defs.' Mot. to Dismiss/Summ. J., Ex. C (4/20/06 Decl. of

Kathy Hsu) (hereinafter "Hsu Decl.") ¶ 4 n.1; Hsu Decl., Ex. 1 (10/25/05 JMD Routing Slip).  By

letter dated November 22, 2005, the Criminal Division acknowledged receipt of Plaintiff's FOIA

request and informed Plaintiff that the Criminal Division was unable to search for the records

Plaintiff requested because Plaintiff had not furnished, as required by 28 C.F.R. § 16.41, a

Privacy Act Identification and Request Form or a current descriptive list of the systems of

records that Plaintiff wished searched.  Defs.' Stmt. of Mat. Facts ¶¶ 33-34; Hsu Decl. ¶ 5; Hsu

Decl., Ex. 2 (11/22/05 letter from T. McIntyre to L. Klayman).  The Criminal Division enclosed

the forms necessary to remedy these deficiencies with its November 22, 2005 letter, and

informed Plaintiff that his request would be closed.  Hsu Decl. ¶ 5; Hsu Decl., Ex. 2 (11/22/05

letter from T. McIntyre to L. Klayman).  The Criminal Division's November 22, 2005 letter

further informed Plaintiff that when the Criminal Division received Plaintiff's completed forms

his request would be reopened under a different number, and that if Plaintiff chose to treat the

9

November 22, 2005 letter as a denial of his FOIA request he could appeal the denial in writing

within sixty (60) days to the DOJ Office of Information and Privacy. *Id.*

By letter dated December 21, 2005, Plaintiff returned the forms to the Criminal Division,

indicating that he wanted the Criminal Division to search four systems of records for records

responsive to his FOIA request. Defs.' Stmt. of Mat. Facts ¶¶ 35-36; Hsu Decl. ¶¶ 6, 10; Hsu

Decl., Ex. 3 (12/21/05 letter from L. Klayman to T. McIntyre). The Criminal Division

acknowledged receipt of the information provided by Plaintiff in a letter dated January 27, 2006,

Defs.' Stmt. of Mat. Facts ¶ 37; Hsu Decl. ¶ 7; Hsu Decl., Ex. 4 (1/27/06 letter from T. McIntyre

to L. Klayman), and subsequently searched the four systems of records identified by Plaintiff,

Defs.' Stmt. of Mat. Facts ¶ 38; Hsu Decl. ¶ 11. The Criminal Division also searched an

additional system of records, which is searched as a matter of course when the Criminal Division

receives a request for records relating to any individual requester, and further requested that the

Counterterrorism Section of the Criminal Division conduct a search for records responsive to

Plaintiff's FOIA request. Defs.' Stmt. of Mat. Facts ¶¶ 39-40; Hsu Decl. ¶¶ 9, 11. None of these

searches identified any records responsive to Plaintiff's FOIA request, and the Criminal Division

so advised Plaintiff in a letter dated March 21, 2006. Defs.' Stmt. of Mat. Facts ¶¶ 41-42; Hsu

Decl. ¶¶ 8, 13; Hsu Decl., Ex. 5 (3/21/06 letter from T. McIntyre to L. Klayman).

### 2. *Plaintiff's FOIA Request to DHS*

DHS responded to Plaintiff's FOIA request on October 5, 2005, advising Plaintiff that

"[DHS] does not maintain a central index of records based on individual names," and that as a

result DHS could not conduct an adequate search based on the information provided by Plaintiff

in his FOIA request. Defs.' Stmt. of Mat. Facts ¶¶ 45-46; Defs.' Mot. to Dismiss/Summ. J., Ex.

D (4/17/06 Decl. of J. Anthony Kendrick) (hereinafter "Kendrick Decl.") ¶ 8; Kendrick Decl.,

Ex. 2 (10/5/05 letter from C. Papoi to L. Klayman).  DHS' October 5, 2005 letter requested that

Plaintiff provide DHS with additional information, including "the DHS component agency you

believe created and/or controls the records, the time period that you believe the records or files

were created and the purpose for which the records were created."  Kendrick Decl., Ex. 2

(10/5/05 letter from C. Papoi to L. Klayman).  DHS further advised Plaintiff that if he provided

the information described in the October 5, 2005 letter within sixty (60) days, DHS would

undertake a search for responsive records; if, however, Plaintiff did not respond within sixty (60)

days, DHS would administratively close Plaintiff's FOIA request.  Defs.' Stmt. of Mat. Facts ¶

47; Kendrick Decl. ¶ 8; Kendrick Decl., Ex. 2 (10/5/05 letter from C. Papoi to L. Klayman).

DHS has no record of receiving any further communication from Plaintiff.  Defs.' Stmt. of Mat.

Facts ¶ 48; Kendrick Decl. ¶ 8.

> 3.    *Plaintiff's FOIA Request to TSA*

TSA acknowledged Plaintiff's FOIA request by letter dated October 4, 2005.  Defs.'

Stmt. of Mat. Facts ¶ 49; Defs.' Mot. to Dismiss/Summ. J., Ex. E (5/1/06 Decl. of Catrina M.

Pavlick) (hereinafter "Pavlick Decl.") ¶ 6; Pavlick Decl., Ex. C (10/4/05 letter from C. Pavlick to

L. Klayman).  On October 5, 2005, TSA's FOIA Officer, Catrina M. Pavlick, contacted

Plaintiff's counsel, Larry Klayman, via telephone to discuss the scope of the request and to obtain

more information about Plaintiff's association or contacts with TSA, in order to focus TSA's

search for responsive records.  Defs.' Stmt. of Mat. Facts ¶ 50; Pavlick Decl. ¶ 7.  Mr. Klayman

told Pavlick that Plaintiff believed himself to be on a TSA watch list as a result of comments he

made to a Southwest Airlines representative and confirmed that Plaintiff sought any TSA record

indicating that Plaintiff was on a TSA watch list. Pavlick Decl. ¶ 7. Based on this conversation, Pavlick understood that Mr. Klayman had narrowed the scope of Plaintiff's FOIA request, and TSA accordingly limited its initial search to records concerning the appearance of Plaintiff's name on a TSA watch list. *Id.* ¶¶ 7, 15; Defs.' Stmt. of Mat. Facts ¶¶ 51-52.

By letter dated November 14, 2005, TSA denied Plaintiff's request for expedited processing, and further advised Plaintiff that he was required to justify his request for a fee waiver based on six factors provided in the DHS FOIA regulation within ten days or his fee waiver would be denied. Pavlick Decl. ¶ 8; Pavlick Decl., Ex. D (11/14/05 letter from C. Pavlick to L. Klayman). Plaintiff did not provide the requested fee waiver justification, and TSA therefore denied his fee waiver request. Pavlick Decl. ¶ 8. Plaintiff appealed TSA's denial of his request for a fee waiver and expedited treatment in a letter dated December 6, 2005, reiterating that he believed immediate action was necessary regarding his FOIA request. Defs.' Stmt. of Mat. Facts ¶ 54; Pavlick Decl. ¶ 9; Pavlick Decl., Ex. E (12/6/05 letter from L. Klayman to C. Pavlick).

On December 7, 2005, TSA contacted Mr. Klayman via telephone, advised him that the TSA Office of the Ombudsman provides a watch list clearance protocol, and directed him to the TSA website so that Plaintiff could initiate the clearance process. Defs.' Stmt. of Mat. Facts ¶ 55; Pavlick Decl. ¶ 10. TSA subsequently officially responded to Plaintiff's FOIA request by letter dated December 8, 2005, in which TSA neither confirmed nor denied the existence of any records pertaining to Plaintiff on any TSA watch list, pursuant to 49 U.S.C. § 114(s) and 49 C.F.R. § 1520.15. Defs.' Stmt. of Mat. Facts ¶ 56; Pavlick Decl. ¶ 11; Pavlick Decl., Ex. F (12/8/05 letter from C. Pavlick to L. Klayman). TSA's December 8, 2005 letter also advised

Plaintiff again of the TSA Office of the Ombudsman watch list clearance protocol and provided contact information for that office. Defs.' Stmt. of Mat. Facts ¶ 57; Pavlick Decl. ¶ 11; Pavlick Decl., Ex. F (12/8/05 letter from C. Pavlick to L. Klayman). By letter dated January 4, 2006, TSA responded to Plaintiff's appeal of TSA's denial of his requests for fee waiver and expedited processing by informing Plaintiff that it had responded to Plaintiff's FOIA request on December 8, 2005 and that there was no fee associated with processing his request. Defs.' Stmt. of Mat. Facts ¶ 62; Pavlick Decl. ¶ 12; Pavlick Decl., Ex. G (1/4/06 letter from C. Pavlick to L. Klayman).

Plaintiff appealed TSA's December 8, 2005 response to his FOIA request by letter dated February 7, 2006. Defs.' Stmt. of Mat. Facts ¶ 63; Pavlick Decl. ¶ 13; Pavlick Decl., Ex. H (2/7/06 letter from J. Goodman to D. Callen). Plaintiff appealed on two grounds: (1) that TSA's refusal to confirm or deny whether Plaintiff is on a watch list was unresponsive because Plaintiff's FOIA request was not limited to information concerning watch lists; and (2) that, even if the request encompassed information concerning TSA watch lists, Plaintiff was entitled to such information because he believed he was improperly placed on a watch list. *Id.* Based on Plaintiff's appeal, TSA initiated a more extensive search for responsive records by identifying ten offices that were most likely to have records concerning members of the general public and requesting that those offices search for responsive documents. Defs.' Stmt. of Mat. Facts ¶¶ 64-65; Pavlick Decl. ¶ 16. These offices included: Executive Secretariat, Office of Chief Counsel, Legislative Affairs, Office of Transportation Security Intelligence, Operations and Technical Training Divisions, Internal Affairs, Office of Human Capital, Security Operations, Office of Threat Assessment and Credentialing ("TTAC"), and the Office of the Ombudsman. Defs.'

13

Stmt. of Mat. Facts ¶ 66; Pavlick Decl. ¶ 16.

Eight of these ten offices failed to locate any documents responsive to Plaintiff's FOIA request, while two of the ten offices – the Office of the Ombudsman and TTAC – each located a record that may be responsive to Plaintiff's request. Defs.' Stmt. of Mat. Facts ¶¶ 67-68; Pavlick Decl. ¶¶ 17-18. However, TSA could not determine whether the potentially responsive records pertained to Plaintiff because the personal information provided by Plaintiff on his DOJ Certification of Identity Form did not match the identifying information contained in the potentially responsive records. Defs.' Stmt. of Mat. Facts ¶¶ 68-70; Pavlick Decl. ¶ 18.

On April 24, 2006, TSA responded to Plaintiff's February 7, 2006 letter by affirming TSA's initial determination to neither confirm nor deny the existence of records indicating whether Plaintiff is on a TSA watch list, thus denying Plaintiff's appeal in part. Defs.' Stmt. of Mat. Facts ¶ 71; Pavlick Decl. ¶ 14; Pavlick Decl., Ex. I (4/24/06 letter from T. Miller to L. Klayman). TSA's April 24, 2006 letter also granted in part Plaintiff's appeal as to the scope of the records searched, and informed Plaintiff that TSA's FOIA office had conducted a new search for records responsive to Plaintiff's FOIA request. Defs.' Stmt. of Mat. Facts ¶ 72; Pavlick Decl. ¶ 14; Pavlick Decl., Ex. I (4/24/06 letter from T. Miller to L. Klayman). TSA told Plaintiff that its new search had revealed two potentially responsive documents, but that TSA was unable to ensure that the potentially responsive records pertained to Plaintiff and that to mistakenly release the documents could constitute a violation of the Privacy Act, 5 U.S.C. § 552a(b). *Id.* As such, TSA requested that Plaintiff provide to TSA: (1) any addresses used by Plaintiff during June 2004; and (2) information concerning any contacts Plaintiff had initiated with TSA, including the offices contacted, the general subject matter of the contact, and the approximate date range. *Id.*

14

TSA requested that Plaintiff provide TSA with this information by November 27, 2006, Pavlick

Decl., Ex. I (4/24/06 letter from T. Miller to L. Klayman); however, in connection with its

motion for summary judgment, TSA continued to assert that if Plaintiff provided the additional

requested information to TSA in a timely manner, TSA would ascertain whether the potentially

responsive records relate to Plaintiff and release all reasonably segregable non-exempt portions

of such documents to Plaintiff, Defs.' Stmt. of Mat. Facts ¶ 73.

   C. *Plaintiff's Filing of His Complaint and Subsequent Events*

   Plaintiff filed his four-count Complaint with this Court on February 21, 2006.  Count IV

of Plaintiff's Complaint alleges that he properly filed FOIA requests with DOJ, DHS and TSA

and that all three agencies have improperly "refused to turn over the requested documents,

refused to grant expedited processing, and refused to consider any fee waivers."  Compl. ¶¶ 77-

81.  The other three Counts of Plaintiff's Complaint relate to his allegations regarding

Defendants' alleged wiretapping and physical surveillance of Plaintiff and Plaintiff's allegedly

improper placement on TSA watch lists.  Count I asserts that Defendants have violated the

Fourth Amendment to the United States Constitution, Compl. ¶¶ 49-57; Count II asserts that

Defendants have deprived Plaintiff of his fundamental right to privacy, Compl. ¶¶ 58-66; and

Count III asserts that Defendants have deprived Plaintiff of his rights under the First Amendment

to the United States Constitution by retaliating against him for comments he made to a Southwest

Airlines employee, Compl. ¶¶ 67-76.

   On May 1, 2006, Defendants filed a motion to dismiss and for summary judgment.

Defendants assert that their respective agencies responded to Plaintiff's FOIA request, that none

of their agencies improperly withheld documents, and that as a result they are entitled to

summary judgment on Count IV of Plaintiff's Complaint. Defs.' Mot. to Dismiss/Summ. J. at 2-20. In addition, Defendants argue that, if this Court concludes that Counts I, II, and III of Plaintiff's Complaint were brought against Defendants, those Counts should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) because Plaintiff lacks Article III standing with respect to those claims. *Id.* at 21-35. Plaintiff filed his Opposition and Memorandum of Law in Opposition to the Motion of the Official Capacity Defendants – Alberto Gonzales, Michael Chertoff, and Edmund Hawley – to Dismiss Under 12(b)(1) and for Summary Judgment (hereinafter "Pl.'s Opp'n.") on September 1, 2006. Plaintiff's Opposition clarifies that he intended to bring all four Counts of his Complaint against Attorney General Gonzales, Secretary Chertoff, and Administrator Hawley in their official capacities, stating that his "claims against Gonzales, Chertoff, and Hawley properly are construed as claims against their respective agencies . . . for their concerted and coordinated acts in approving, administering, and participating in the monitoring and surveillance of Plaintiff, in violation of his Constitutional rights." Pl.'s Opp'n. at 14. Plaintiff's Opposition further asserts that Defendants are not entitled to summary judgment on Plaintiff's FOIA claim, *id.* at 25-40, and that Plaintiff has met the requirements for Article III standing, *id.* at 11-25. Defendants filed their Reply in Support of Motion of the Official Capacity Defendants to Dismiss and for Summary Judgment (hereinafter "Defs.' Reply") on October 16, 2006.

## II: LEGAL STANDARDS

### A.    *Motion for Summary Judgment Under the FOIA*

In reviewing a motion for summary judgment under the FOIA, the Court must conduct a *de novo* review of the record. *See* 5 U.S.C. § 552(a)(4)(B). In the FOIA context, "*de novo*

review requires the court to 'ascertain whether the agency has sustained its burden of demonstrating that the documents requested are not "agency records" or are exempt from disclosure under the FOIA.'" *Assassination Archives & Research Ctr. v. Cent. Intelligence Agency*, 334 F.3d 55, 57 (D.C. Cir. 2003) (quoting *Summers v. Dep't of Justice*, 140 F.3d 1077, 1080 (D.C. Cir. 1998)).

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only when there is sufficient evidence such that a reasonable juror could find for the party opposing the motion. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251-42, 106 S. Ct. 2505, 91 L. Ed.2d 202 (1986). Furthermore, entry of summary judgment is mandated against a party if, after adequate time for discovery and upon motion, the party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). FOIA cases are typically and appropriately decided on motions for summary judgment. *Miscavige v. Internal Revenue Serv.*, 2 F.3d 366, 368 (11th Cir. 1993); *Rushford v. Civiletti*, 485 F. Supp. 477, 481 n.13 (D.D.C. 1980). Under FOIA, all underlying facts and inferences are analyzed in the light most favorable to the FOIA requester; as such, only after an agency seeking it proves that it has fully discharged its FOIA obligations is summary judgment appropriate. *Moore v. Aspin*, 916 F. Supp 32, 35 (D.D.C. 1996) (citing *Weisberg v. Dep't of Justice*, 705 F.2d 1344, 1350 (D.C. Cir. 1983)). The agency bears the burden of demonstrating that its search was

17

adequate and in good faith. *Tarullo v. Dep't of Defense*, 170 F. Supp. 2d 271, 274 (D. Conn. 2001). A good faith search effort uses methods that can be reasonably expected to produce the information requested. *See Ogelsby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).

As a general rule, an agency must make its records available to a requester under the FOIA with some exceptions. *See* 5 U.S.C. §§ 552(a)(3) & (b). The FOIA contains nine statutory exemptions under which the Government may properly withhold requested information. *Id.* § 552(a)(4)(B). The agency must demonstrate the validity of any exemption that it asserts. *See id.*; *Beck v. Dep't of Justice*, 997 F.2d 1489, 1491 (D.C. Cir. 1993) ("[c]onsistent with the purpose of the Act, the burden is on the agency to justify withholding requested documents"). An agency seeking to withhold information must provide a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply. *King v. Dep't of Justice*, 830 F.2d 210, 219 (D.C. Cir. 1987). The submission of an agency declaration that describes the withheld material with reasonable specificity as well as the reasons for nondisclosure may satisfy the Government's burden. *See Campbell v. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998). The justifications cannot be conclusory, merely reciting statutory standards, vague, or sweeping. *King*, 830 F.2d at 219. However, "summary judgment may be granted solely on the basis of agency affidavits provided that they are clear, specific, and reasonably detailed, and there is no contradictory evidence of agency bad faith." *W. Ctr. for Journalism v. Internal Revenue Serv.*, 116 F. Supp. 2d 1, 7 (D.D.C. 2000) (citing *Hayden v. Nat'l Sec. Agency*, 608 F.2d 1381, 1387 (D.C. Cir. 1979)); *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984).

B.    *Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1)*

A court must dismiss a case when it lacks subject matter jurisdiction pursuant to Rule 12(b)(1).  In general, a motion to dismiss under Federal Rule of Civil Procedure 12(b) should not prevail "unless plaintiffs can prove no set of facts in support of their claim that would entitle them to relief."  *Kowal v. MCI Commc'ns. Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  A court may appropriately dispose of a case under 12(b)(1) for standing, and may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (citations omitted); *see also Artis v. Greenspan*, 223 F. Supp. 2d 139, 152 n.1 (D.D.C. 2002) ("A court may consider material outside of the pleadings in ruling on a motion to dismiss for lack of venue, personal jurisdiction or subject matter jurisdiction."); *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999) ("where a document is referred to in the complaint and is central to plaintiff's claim, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment") (citing *Greenberg v. The Life Ins. Co. of Virginia*, 177 F.3d 507, 515 (6th Cir. 1999)).  At the stage in litigation when dismissal is sought, the plaintiff's complaint must be construed liberally, and the plaintiff should receive the benefit of all favorable inferences that can be drawn from the alleged facts.  *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  In spite of the favorable inferences that a plaintiff receives on a motion to dismiss, it remains the plaintiff's burden to prove subject matter jurisdiction by a preponderance of the evidence.  *Am. Farm Bureau v. Envtl. Prot. Agency*, 121 F. Supp. 2d 84, 90 (D.D.C. 2000).

### III: DISCUSSION

Defendants have filed a motion seeking summary judgment as to Plaintiff's FOIA Count
as well as dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) of Plaintiff's Counts
alleging Constitutional torts based on defendants' allegedly improper wiretapping, surveillance
activities, and placement of Plaintiff on TSA watch lists.  Plaintiff opposes both portions of
Defendants' motion.  In addressing Defendants' motion, the Court shall consider the issues in the
order in which they are raised by Defendants – first considering their motion for summary
judgment as to Count IV (FOIA), before turning to their motion to dismiss Count I (Fourth
Amendment), Count II (Right to Privacy), and Count III (First Amendment).

   A.     *Motion for Summary Judgment as to Count IV (FOIA) of Plaintiff's Complaint*

The Freedom of Information Act requires federal agencies, in responding to a request for
information, to: (1) conduct an adequate search for that information through reasonable efforts;
(2) provide the information to the requester, unless it falls within a FOIA exemption; and (3)
provide to a requester any information that can reasonably be segregated from the exempt
information.  5 U.S.C. § 552(a)(3); 5 U.S.C. § 552(b).  In determining the adequacy of a FOIA
search, the Court is guided by principles of reasonableness.  *Ogelsby*, 920 F.2d at 68.  To obtain
summary judgment on the issue of the adequacy of the records search, an agency must show
"viewing the facts in the light most favorable to the requester, that . . . [it] has conducted a
'search reasonably calculated to uncover relevant documents.'"  *Steinberg v. Dep't. of Justice*, 23
F.3d 548, 551 (D.C. Cir. 1994) (quoting *Weisberg v. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C.
Cir. 1984)).  To meet its burden, the agency may submit affidavits or declarations that explain
both in reasonable detail and in a non-conclusory fashion the scope and method of the agency's

search. *Perry v. Block*, 684 F.2d 121, 126 (D.C. Cir. 1982). In the absence of contrary evidence, such affidavits or declarations are sufficient to demonstrate an agency's compliance with the FOIA. *Id.* at 127. An agency must show that it made a "good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Ogelsby*, 920 F.2d at 68; *see Campbell*, 164 F.3d at 27. An agency's search need not be exhaustive, merely reasonable. *See W. Ctr. for Journalism*, 116 F. Supp. 2d at 8 (citing *Shaw v. Dep't of State*, 559 F. Supp. 1053, 1057 (D.D.C. 1983)).

Defendants' motion for summary judgment asserts that their respective agencies – DOJ, DHS, and TSA – have all conducted reasonable searches, have not withheld agency records from Plaintiff, and have therefore fulfilled their obligations under the FOIA. Defs.' Mot. to Dismiss/Summ. J. at 1. Plaintiff does not respond to Defendants' arguments regarding DOJ, other than to assert that the FBI's search may not have been adequate, Pl.'s Opp'n. at 40, but does argue that summary judgment is inappropriate as to DHS' and TSA's responses to Plaintiff's FOIA request, *id.* at 25-39.[2] Based primarily on the declarations filed by Defendants in support of their motion for summary judgment, the Court finds that Defendants have met the standard for summary judgment by demonstrating that each of their respective agencies

---

[2] Plaintiff also fails to respond to Defendants' assertions that Plaintiff's requests for expedited processing and for a fee waiver are moot in light of their respective agencies' responses to Plaintiff's FOIA request. The Court agrees with Defendants that Plaintiff's request for expedited processing is mooted by the agencies' responses, *see Landmark Legal Found. v. Envtl. Prot. Agency*, 272 F. Supp. 2d 59, 62 (D.D.C. 2003) (finding that challenge regarding expedited processing did not preclude summary judgment because the "only question . . . is whether the agency finally conducted a reasonable search, and whether its withholdings are justified."), and also that Plaintiff's request for a fee waiver is moot because none of the agencies charged Plaintiff any fees, *see Hall v. Cent. Intelligence Agency*, 437 F.3d 94, 99 (D.C. Cir. 2006).

conducted reasonable searches and did not improperly withhold agency records from Plaintiff.

The Court shall therefore grant Defendants' motion for summary judgment as to Count IV of

Plaintiff's Complaint.

   1. *DOJ's Reponse to Plaintiff's FOIA Request*

   Upon receiving Plaintiff's FOIA request, DOJ's FOIA/PA Mail Referral Unit of the

Justice Management Division ("JMD") routed Plaintiff's request to the FBI, EOUSA, and the

Criminal Division. Hardy Decl., Ex. A (JMD Routing Slip). Defendants maintain that all three

components of DOJ "responded to plaintiff's request in a manner fully compliant with the

requirements of FOIA" and that, as a result, "plaintiff can seek no relief against the Attorney

General arising from their responses." Defs.' Mot. to Dismiss/Summ. J. at 4.

   a. *The FBI*

   Plaintiff's Opposition states that "while the FBI may have been somewhat more thorough

than the other agency defendants, an adequate search may not have been conducted." Pl.'s

Opp'n. at 40. Plaintiff does not explain why he believes the FBI's search "may not have been"

adequate, beyond suggesting that "numerous public disclosures and news reports" indicate that

the FBI's "database is not 'centralized'" and that "much of the relevant information is likely to be

contained within local field offices." *Id.* However, as Defendants correctly argue, Plaintiff's

failure to exhaust his administrative remedies with respect to the FBI's response to his FOIA

request is fatal to his attempt to challenge that response in front of this Court. Moreover, even if

Plaintiff had exhausted his administrative remedies as required, the Declaration of David M.

Hardy, which Defendants submitted in support of their motion for summary judgment,

demonstrates that the FBI's search in response to Plaintiff's FOIA request was adequate and

reasonable.[3]

Upon receiving Plaintiff's FOIA request, the FBI searched for responsive records via the CRS, by searching for fifteen different combinations of Plaintiff's first, middle, and last names, as well as his date of birth and Social Security number. Defs.' Stmt. of Mat. Facts ¶¶ 8-9; Hardy Decl. ¶¶ 8, 19. The FBI notified Plaintiff that this search failed to locate any responsive records, and alerted Plaintiff to the fact that he could appeal the FBI's "no records" response in writing within sixty (60) days. Defs.' Stmt. of Mat. Facts ¶¶ 17-18; Hardy Decl. ¶ 6; Hardy Decl., Ex. B (10/28/05 letter from D. Hardy to L. Klayman). As of March 15, 2006, Plaintiff had not appealed the FBI's "no records" response. Defs.' Stmt. of Mat. Facts ¶ 24; Hardy Decl. ¶ 7. Although exhaustion of a FOIA request is not jurisdictional, failure to exhaust has repeatedly been held to preclude judicial review of FOIA responses as a prudential matter, and thus to be a "mandatory prerequisite to a lawsuit under the FOIA." *See Wilbur v. Cent. Intelligence Agency*, 355 F.3d 675, 676-77 (D.C. Cir. 2004) (citing *Hidalgo v. Fed. Bureau of Investigation*, 344 F.3d 1256, 1258 (D.C. Cir. 2003) and *Oglesby*, 920 F.2d at 61). Therefore, Plaintiff's failure to appeal the FBI's "no records" response is alone a sufficient grounds on which to grant Defendants' motion for summary judgment as to the FBI's response.

In addition, however, the Declaration of David M. Hardy demonstrates that the FBI's search in this case was reasonable and adequate. The FBI initially searched the main entries of

---

[3] Mr. Hardy has been the Section Chief of the Record/Information Dissemination Section, Records Management Division, at FBI headquarters in Washington, D.C. since August 2002. Hardy Decl. ¶ 1. Prior to joining the FBI, from May 2001 to July 2002, Mr. Hardy was the Assistant Judge Advocate General of the Navy for Civil Law, and in that position had direct oversight of FOIA policy, procedures, appeals, and litigation for the Navy. *Id.* Mr. Hardy also worked on FOIA matters from October 1980 through April 2001 while serving at various commands as a Navy Judge Advocate. *Id.*

the CRS in response to Plaintiff's FOIA request and, upon receiving Plaintiff's Complaint in this

litigation, conducted a second search for cross-references in the CRS, Defs.' Stmt. of Mat. Facts

¶¶ 19-20; Hardy Decl. ¶ 20, as well as a search of its ELSUR indices, Defs.' Stmt. of Mat. Facts

¶ 23; Hardy Decl. ¶ 20.  That these searches did not reveal responsive records does not make the

searches themselves any less reasonable or adequate, especially as Plaintiff has not pointed to any

evidence or articulated a basis for challenging the reasonableness of the FBI's search.  Indeed,

numerous courts have determined that the FBI performed reasonable and adequate searches

where the FBI's affidavits established that searches were conducted via the CRS and the ELSUR

indices.  *See Edmonds v. Fed. Bureau of Investigation*, 272 F. Supp. 2d 35, 57-58 (D.D.C. 2003)

(FBI response to FOIA request was reasonable and adequate where FBI searched CRS and

ELSUR for responsive records); *Brunetti v. Fed. Bureau of Investigation*, 357 F. Supp. 2d 97,

103 (D.D.C. 2004) (FBI search of CRS was a reasonable and adequate response to FOIA

request); *Voinche v. Fed. Bureau of Investigation*, 412 F. Supp. 2d 60, 66 (D.D.C. 2006) (same).

　　Furthermore, Plaintiff's unsubstantiated suggestion that responsive records may be

located in FBI field offices is of no consequence.  FOIA's disclosure obligations apply when

requests for records are "made in accordance with published rules stating the time, place, fees (if

any), and procedures to be followed . . . ."  5 U.S.C. § 552(a)(3)(A).  Here, DOJ regulations

require that FOIA requesters seeking records held by individual field offices write directly to

those field offices.  28 C.F.R. § 16.3(a).  Nevertheless, Plaintiff sent his FOIA request to DOJ's

JMD and did not include in his request any information from which the FBI could be expected to

discern which field offices, if any, might have records responsive to Plaintiff's request.

*See* Hardy Decl., Ex. A (10/3/05 FOIA request).  Where a requester submits his request only to

FBI headquarters and not to individual field offices, the FBI is under no obligation to search all of its field offices. *See Ray v. Fed. Bureau of Investigation*, 441 F. Supp. 2d 27, 31 (D.D.C. 2006) ("the FBI is not required to undertake a search of its field offices' records when a requester submits his request only to its headquarters."); *see also Marks v. United States Dep't of Justice*, 578 F.2d 261, 263 (9th Cir. 1978) (same). As a result, the Court concludes that the FBI has demonstrated that its search was reasonable and adequate and that, in any event, Plaintiff's failure to appeal the FBI's "no records" response precludes him from raising such a challenge before this Court.

> b.      *EOUSA*

Plaintiff's Opposition to Defendants' motion for summary judgment does not challenge their assertion that summary judgment is appropriate as to EOUSA's response to Plaintiff's FOIA request. Plaintiff has therefore failed to demonstrate that any genuine issue of material fact exists, as the Declaration of Anthony J. Ciccone establishes that Plaintiff failed to respond to EOUSA's reasonable request for specification.[4]

FOIA requires agencies to make their records available in response to requests that "reasonably describe" the records sought, 5 U.S.C. § 552(a)(3)(A), and DOJ regulations provide that where a "component determines that [a] request does not reasonably describe records, it shall tell [the requester] . . . so that [the requester] . . . may modify it to meet the requirements of [FOIA]." 28 C.F.R. § 16.3(b). Records are "reasonably described" when the description would

---

[4] Mr. Ciccone is a DOJ Senior Attorney Advisor assigned to the EOUSA Freedom of Information and Privacy Staff, and has previously served within DOJ as a Trial Attorney/FOIA-Privacy Counsel in the Executive Office for United States Trustees from 1997 to 2004. Ciccone Decl. ¶ 1.

"enable[] a professional employee of the agency who was familiar with the subject area of the request to locate the record with a reasonable amount of effort," *Dale v. Internal Revenue Serv.*, 238 F. Supp. 2d 99, 104 (D.D.C. 2002) (citing *Marks*, 578 F.2d at 263), and "[b]road, sweeping requests lacking specificity are not sufficient, *id.* (citing *American Fed. of Gov't Employees v. Dep't of Commerce*, 632 F. Supp. 1272, 1277 (D.D.C. 1986)). Here, EOUSA informed Plaintiff by letter dated November 8, 2005 that "[s]ince the files . . . of United States Attorneys are located in more than 100 separate offices throughout the country, we ask that you identify the specific U.S. Attorney's office(s) where you believe the requested records exist. . . ." Defs.' Stmt. of Mat. Facts ¶ 28; Ciccone Decl. ¶ 12 & Ex.3 (11/8/05 letter from M. O'Rourke to L. Klayman).

Plaintiff has neither provided the additional information requested by EOUSA nor appealed EOUSA's November 8, 2005 letter, Defs.' Stmt. of Mat. Facts ¶¶ 29-31; Ciccone Decl. ¶¶ 13-14; Ciccone Decl., Ex. 3 (11/8/05 letter from M. O'Rourke to L. Klayman), and as a result has failed to exhaust his administrative remedies. *See Antonelli v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. Civ. A. 04-1180, 2006 WL 141732 at *2-3 (D.D.C. Jan. 18, 2006) (Plaintiff failed to exhaust administrative remedies by not responding to Department of Transportation's request for specification); *Dale*, 238 F. Supp. 2d at 103 ("Failure to comply with agency FOIA regulations amounts to a failure to exhaust administrative remedies."). The Court shall therefore grant Defendants' motion for summary judgment as to EOUSA's response to Plaintiff's FOIA request.

   *c.* *The Criminal Division*

Plaintiff's Opposition to Defendants' motion for summary judgment also does not challenge their assertion that summary judgment is appropriate as to the Criminal Division's

response to Plaintiff's FOIA request.  Moreover, the Declaration of Kathy Hsu establishes that the Criminal Division conducted a reasonable and adequate search that uncovered no records responsive to Plaintiff's FOIA request.[5]

Like the EOUSA, the Criminal Division determined that Plaintiff's FOIA request was insufficient, and requested that Plaintiff furnish (as required by 28 C.F.R. § 16.41) a Privacy Act Identification and Request Form and a current descriptive list of the systems of records maintained by the Criminal Division that Plaintiff wished searched.  Defs.' Stmt. of Mat. Facts ¶¶ 33-34; Hsu Decl. ¶ 5; Hsu Decl., Ex. 2 (11/22/05 letter from T. McIntyre to L. Klayman).  In the case of the Criminal Division, however, Plaintiff provided the requested information, indicating that he wanted the Criminal Division to search four systems of records for responsive records.  Defs.' Stmt. of Mat. Facts ¶¶ 35-36; Hsu Decl. ¶¶ 6, 10; Hsu Decl., Ex. 3 (12/21/05 letter from L. Klayman to T. McIntyre).  The Criminal Division subsequently searched these four systems of records, Defs.' Stmt. of Mat. Facts ¶ 38; Hsu Decl. ¶ 11, and also searched an additional system of records, as well as requested that the Counterterrorism Section of the Criminal Division conduct a search for responsive records.  Defs.' Stmt. of Mat. Facts ¶¶ 39-40; Hsu Decl. ¶¶ 9, 11.  None of these searches identified any records responsive to Plaintiff's FOIA request.  Defs.' Stmt. of Mat. Facts ¶¶ 41-42; Hsu Decl. ¶¶ 8, 13.

Ms. Hsu's Declaration thus establishes that the Criminal Division made a "good faith effort to conduct a search for the requested records, using methods which [could] reasonably be expected to produce the information requested."  *Ogelsby*, 920 F.2d at 68.  As Plaintiff does not

---

[5] Ms. Hsu is an attorney in the Criminal Division whose specific assignment within the Office of Enforcement Operations is that of Litigation Attorney for the Division's Freedom of Information Act/Privacy Act Unit.  Hsu Decl. ¶ 1.

challenge the reasonableness of this search, the Court concludes that the Criminal Division has

met the standard for summary judgment by demonstrating that it fulfilled its obligations under

the FOIA.

      2.     *DHS' Response to Plaintiff's FOIA Request*

Like DOJ, DHS has established, through the Declaration of J. Anthony Kendrick, that it

fulfilled its obligations under the FOIA and that Plaintiff has failed to exhaust his administrative

remedies.[6] Upon receiving Plaintiff's FOIA request, DHS determined that it was unable to

conduct an adequate search based on the information provided by Plaintiff. Kendrick Decl. ¶ 7.

Mr. Kendrick states that DHS' inability to respond Plaintiff's FOIA request arose from the fact

that, "[a]lthough [Plaintiff's FOIA] request lists a wide variety of types of documents that are

being requested, there is nothing in the correspondence that indicates why plaintiff believes that

DHS would maintain any of these types of documents about him." *Id.*; Kendrick Decl., Att. 1

(10/3/05 FOIA Request). Mr. Kendrick avers that DHS "does not maintain a central index of

records that are retrieved by name or personal identifier, and so it is important to understand the

nature of the request in context; i.e., why the requester believes that DHS may have records

pertaining to the requester." Kendrick Decl. ¶ 5. Mr. Kendrick further avers that "[i]n the

absence of such file- or event-related information or any details as to why the Department would

maintain records about plaintiff, [his] staff cannot even begin to search for records." Kendrick

Decl. ¶ 7.

As noted above, FOIA requires agencies to process requests for records that "reasonably

---

[6] Mr. Kendrick has been Director of Departmental Disclosure for DHS since May 2004, and has many prior years of experience administering FOIA programs in federal agencies. Kendrick Decl. ¶¶ 1-2.

describe" the records sought and are "made in accordance with published rules . . . ."  5 U.S.C. §

552(a)(3)(A).  DHS regulations provide that, "whenever possible, [FOIA requests] should

include specific information about each record sought, such as the date, title or name, author,

recipient, and subject matter of the record," 6 C.F.R. § 5.3(b) and explain that "[a]s a general

rule, the more specific you are about the records or type of records that you want, the more likely

the Department will be able to locate those records in response to your request," *id.*  Furthermore,

"[i]f a component determines that your request does not reasonably describe records, it shall tell

you either what additional information is needed or why your request is otherwise insufficient."

*Id.*

   Here, by letter dated October 5, 2005, DHS advised Plaintiff that "[DHS] does not

maintain a central index of records based on individual names," and that as a result DHS could

not conduct an adequate search based on Plaintiff's FOIA request.  Defs.' Stmt. of Mat. Facts ¶¶

45-46; Kendrick Decl. ¶ 8; Kendrick Decl., Ex. 2 (10/5/05 letter from C. Papoi to L. Klayman).

Consistent with DHS regulations, DHS requested that Plaintiff provide DHS with additional

information, specifically "the DHS component agency you believe created and/or controls the

records, the time period that you believe the records or files were created and the purpose for

which the records were created."  Kendrick Decl., Ex. 2 (10/5/05 letter from C. Papoi to L.

Klayman).  DHS further advised Plaintiff that DHS would undertake a search for responsive

records if he provided the requested information within sixty (60) days; however, if Plaintiff did

not respond within sixty (60) days, DHS would administratively close Plaintiff's FOIA request.

Defs.' Stmt. of Mat. Facts ¶ 47; Kendrick Decl. ¶ 8; Kendrick Decl., Ex. 2 (10/5/05 letter from C.

Papoi to L. Klayman).  DHS has no record of receiving any further communication from

Plaintiff.  Defs.' Stmt. of Mat. Facts ¶ 48; Kendrick Decl. ¶ 8.

Plaintiff asserts various arguments in opposition to Defendants' motion for summary judgment as to DHS' response to Plaintiff's FOIA request.  First, Plaintiff argues that the burden is on the government to demonstrate that the agency has met its obligations under the FOIA and that "DHS' explanation that it cannot conduct a search based upon individual names is neither reasonable, nor credible."  Pl.'s Opp'n. at 27.  Plaintiff claims that "[i]t defies logic and imagination, and is simply implausible that the Department of Homeland Security does not maintain a 'database of records based on individual names.'"  *Id.* at 26 n.7.  Plaintiff is correct that the government bears the burden of showing that DHS appropriately responded to Plaintiff's FOIA request.  However, as discussed above, Defendants have submitted Mr. Kendrick's sworn Declaration, in which he avers that DHS does not maintain a centralized system of records based on individual names and that, as a result, DHS requires specific information about the records sought in order to perform adequate searches.  Kendrick Decl. ¶¶ 6-7.  Moreover, Mr. Kendrick's Declaration is consistent with the DHS regulations described above, which advise requesters that DHS is more likely to locate responsive records if provided with detailed information regarding the records sought.  *See* 6 C.F.R. § 5.3(b).  For his part, Plaintiff has offered only his incredulity that DHS is unable to search its records based on individual names, which amounts to mere speculation.  In the face of Mr. Kendrick's "clear, specific, and reasonably detailed" Declaration, Plaintiff's speculation will not preclude summary judgment as to DHS' response to his FOIA request.  *W. Ctr. for Journalism*, 116 F. Supp. 2d at 7 (citing *Hayden v. Nat'l Sec. Agency*, 608 F.2d 1381, 1387 (D.C. Cir. 1979)); *cf. Safecard Sevs. v. Sec. and Exch. Comm'n*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (presumption of good faith accorded to agency affidavits cannot be

rebutted by speculative claims).

Plaintiff further argues that, while DHS would be allowed to request that Plaintiff narrow

the scope of his FOIA request, "DHS did not ask Plaintiff to narrow his search, but, instead, DHS

arbitrarily instructed Plaintiff to disclose to DHS <u>why he believed</u> that DHS would maintain any

of the types of documents about him."  Pl.'s Opp'n. at 29-30 (emphasis in original).  Despite

Plaintiff's argument to the contrary, DHS' request that Plaintiff provide DHS with additional

information, including "the DHS component agency you believe created and/or controls the

records, the time period that you believe the records or files were created and the purpose for

which the records were created," Kendrick Decl., Ex. 2 (10/5/05 letter from C. Papoi to L.

Klayman), was an attempt to narrow Plaintiff's search in order to allow DHS to search for

records responsive to Plaintiff's FOIA request in a manner consistent with DHS' records system.

While Plaintiff claims that DHS' response to his FOIA request was illogical, and "clearly is

designed to obfuscate Plaintiff's ability to seek redress under FOIA," Pl.'s Opp'n. at 30, Mr.

Kendrick's Declaration demonstrates that DHS' response was appropriate in light of the fact that

DHS does not maintain a centralized system of documents organized by individual name,

Kendrick Decl. ¶¶ 5, 7-8.

Second, Plaintiff asserts that FOIA requires only a "reasonable description of the

requested documents," and that he "provided not only a reasonable description of the requested

documents, but a sufficiently detailed list of documents."  Pl.'s Opp'n. at 27.  Plaintiff is correct

that his FOIA request includes thirty-five (35) different types of documents (*e.g.*,

"correspondence, memoranda, documents, reports, records"), *see* Kendrick Decl., Att. 1 (10/3/05

FOIA Request); however, as to the substance of the requested records, Plaintiff's FOIA request

31

simply seeks all documents of these thirty-five types "that refer to [Plaintiff]," *id.* As noted

above, FOIA requests "reasonably describe" records when the description would "enable[] a

professional employee of the agency who was familiar with the subject area of the request to

locate the record with a reasonable amount of effort." *Dale*, 238 F. Supp. 2d at 104 (D.D.C.

2002) (citing *Marks*, 578 F.2d at 263). Here, based on Mr. Kendrick's Declaration, it is clear that

Plaintiff's FOIA request failed to meet this standard. Indeed, courts have determined that "FOIA

requests for *all* documents concerning a requester are too broad," *id.* (citation omitted), and that

"[a]gencies are not required to perform searches which are not compatible with their own

document retrieval systems," *Sonds v. Huff*, 391 F. Supp. 2d 152, 160 (D.D.C. 2005) (citation

omitted); *Assassination Archives and Research Ctr., Inc. v. Cent. Intelligence Agency*, 720 F.

Supp. 217, 219 (D.C. Cir. 1989) (citing *Blakely v. Dep't. of Justice*, 549 F.Supp. 362 (D.D.C.

1982), *aff'd* 720 F.2d 215 (D.C. Cir. 1983)).[7] As such, Plaintiff's assertion that he provided a

reasonable description of the requested documents does not demonstrate that DHS was required

to perform a search for documents responsive to Plaintiff's request where Plaintiff's request

sought, in very general descriptive terms, thirty-five different types of documents "that refer to

[Plaintiff]."

Moreover, as noted above, DHS did not flatly refuse to conduct a search based on

Plaintiff's FOIA request. Instead, DHS requested that Plaintiff provide such additional

---

[7] Plaintiff's attempt to distinguish cases requiring FOIA requesters to reasonably describe the records they seek on the grounds that those cases involve requests to the IRS, rather than DHS, s*ee* Pl.'s Opp'n. at 28-29, is unavailing as courts have noted this FOIA requirement in cases involving various federal agencies. *See, e.g.*, *Sonds*, 391 F. Supp. 2d at 160 (case involving Drug Enforcement Agency); *Antonelli*, 2006 WL 141732 at *2-3 (case involving Department of Transportation).

information as was necessary to enable DHS to perform a search for records responsive to

Plaintiff's request, and advised Plaintiff that DHS would undertake such a search if Plaintiff

provided the requested information within sixty (60) days.  Defs.' Stmt. of Mat. Facts ¶ 47;

Kendrick Decl. ¶ 8; Kendrick Decl., Ex. 2 (10/5/05 letter from C. Papoi to L. Klayman).  Plaintiff

has not provided DHS with the additional information requested,  Defs.' Stmt. of Mat. Facts ¶

48; Kendrick Decl. ¶ 8; Pl.'s Opp'n. at 32, and has thus failed to exhaust his administrative

remedies, s*ee Antonelli*, 2006 WL 141732 at *2-3; *Dale*, 238 F. Supp. 2d at 103.  Plaintiff

attempts to justify this failure by asserting that "[i]t would have been futile to require Plaintiff to

exhaust his administrative remedies, because the agency ultimately would have rejected

Plaintiff's requests for records."  Pl.'s Opp'n. at 32.  In support of this argument, Plaintiff states

that "in the fall of 2001, the NSA, in conjunction with other executive branch agencies, like TSA,

launched a secret surveillance program to intercept, without judicial authorization, telephone and

internet communications of citizens and lawful permanent residents living inside the United

States," and that "[i]n light of the administration's well-documented and unwavering support of

the surveillance program . . . Plaintiff's decision to forego further administrative remedies was

practical."  *Id.*  However, Plaintiff's argument amounts to pure speculation because, as discussed

below, Plaintiff's Complaint is entirely devoid of a factual predicate demonstrating any

applicability of the National Security Agency's Terrorist Surveillance Program ("TSP") to

Plaintiff himself.  Such speculation does not relieve Plaintiff of his duty to exhaust the

administrative remedies available to him before seeking relief in this Court.

As a result, the Court concludes that Defendants have demonstrated that DHS fulfilled its

FOIA obligations by attempting to conduct a reasonable and adequate search, which was

thwarted by Plaintiff's failure to respond to DHS' request for additional information.

        3.        *TSA's Response to Plaintiff's FOIA Request*

Defendants have also met the standard for summary judgment as to TSA's response to Plaintiff's FOIA request, by establishing that TSA conducted a reasonable and adequate search and appropriately refused to confirm or deny the existence of documents relating to Plaintiff's presence on any watch list.

        a.        *Adequacy of TSA's Search*

As described above, TSA initially limited its search for documents responsive to Plaintiff's FOIA request based on a telephone conversation between TSA's FOIA Officer, Catrina M. Pavlick, and Plaintiff's counsel, Larry Klayman, in which Ms. Pavlick understood Mr. Klayman to seek only records concerning the appearance of Plaintiff's name on a TSA watch list.  Defs.' Stmt. of Mat. Facts ¶¶ 50-52; Pavlick Decl. ¶¶ 7, 15.[8]  Based on this limited search, TSA responded to Plaintiff by advising him that it could neither confirm nor deny the existence of any records pertaining to him on any TSA watch list and alerting him to the existence of the TSA Office of the Ombudsman watch list clearance protocol. Defs.' Stmt. of Mat. Facts ¶¶ 55-57; Pavlick Decl. ¶¶ 10-11; Pavlick Decl., Ex. F (12/8/05 letter from C. Pavlick to L. Klayman).

Plaintiff subsequently appealed TSA's response, and Plaintiff's appeal led TSA to initiate a more extensive search for responsive records in the ten TSA offices that Ms. Pavlick's office identified as most likely to have records concerning members of the general public.  Defs.' Stmt. of Mat. Facts ¶¶ 64-65; Pavlick Decl. ¶ 16.  Eight of these offices failed to locate any documents

---

[8] Ms. Pavlick has been the FOIA Officer for the TSA since September 2003 and in this position is responsible for processing all requests made to TSA under the FOIA and the Privacy Act.  Pavlick Decl. ¶ 1.

responsive to Plaintiff's FOIA request, Defs.' Stmt. of Mat. Facts ¶ 67; Pavlick Decl. ¶ 17;

however, two of the TSA offices searched – the Office of the Ombudsman and TTAC – each

located a potentially responsive record. Defs.' Stmt. of Mat. Facts ¶¶ 67-70; Pavlick Decl. ¶¶ 17-

18. In order to verify that the potentially responsive records pertained to Plaintiff, TSA requested

that Plaintiff provide TSA with additional information, which Plaintiff had not provided by the

time of Defendants' motion for summary judgment. *Id.* Nevertheless, in that motion, TSA

continued to offer to "release all reasonably segregable non-exempt portions of [the potentially

responsive records] in an expeditious manner" if Plaintiff provided the requested information,

Defs.' Mot. to Dismiss/Summ. J. at 21.

Plaintiff's Opposition does not provide the information requested by TSA. Instead,

Plaintiff asserts that "TSA's request for additional information to confirm Plaintiff's identity was

disingenuous" because Plaintiff submitted to TSA a DOJ Certification of Identity Form, which

disclosed his full name, social security number, citizenship, current address, date of birth, and

place of birth. Pl.'s Opp'n. at 36. Plaintiff further asserts that "[a]ccording to DOJ" the

Certification ensures that DOJ does not wrongfully disclose records, *id.*, and that TSA's request

for additional information thus constitutes an improper withholding of documents under the

FOIA, *id.* at 38. Plaintiff's argument regarding the DOJ Certification is inapposite, however, as

Ms. Pavlick's Declaration makes clear that TSA has already attempted, and been unable, to

determine whether the potentially responsive records identified in fact pertain to Plaintiff based

on the Certification alone, and further avers that the information requested by TSA would allow

TSA to make such a determination. Pavlick Decl. ¶¶ 14, 18. Indeed, Ms. Pavlick's Declaration

establishes that – based on the combination of its initial search and its search subsequent to

Plaintiff's appeal – TSA has conducted an adequate and reasonable search, which like other agencies' searches in this case, has been thwarted by Plaintiff's refusal to provide additional information upon request.

    b.  *TSA's Glomar Response*

   Insofar as TSA construed Plaintiff's FOIA request as a request for TSA watch list records concerning Plaintiff, TSA responded to Plaintiff by advising him that "[t]o ensure transportation security, TSA does not disclose the names and identifying information of individuals on TSA watch lists" and that as a result, under 49 U.S.C. § 114(s) and 49 C.F.R. §§ 1520.5 and 1520.15(a), TSA could "neither confirm nor deny the existence of responsive records." Pavlick Decl. ¶¶ 7-8; Pavlick Decl., Ex. F (12/8/05 letter from C. Pavlick to L. Klayman).[9] TSA argues that this refusal was a proper "*Glomar* response" because to "confirm or deny the existence of records . . . would cause harm cognizable under FOIA Exemption 3." Defs.' Mot. to Dismiss/Summ. J. at 16-17 (citing *Gardels v. Cent. Intelligence Agency*, 689 F.2d 1100, 1103 (D.C. Cir. 1982)).[10] For his part, Plaintiff asserts that TSA's *Glomar* response does not square with FOIA's "dominant objective" of disclosure and that TSA is required to, but has not, described the documents it has withheld from Plaintiff. Pl.'s Opp'n. at 38-39. Plaintiff therefore "requests that the TSA deliver to the Court for an in camera inspection, a "*Vaughn* index" . . . as well as the documents themselves." *Id.* at 39.

---

  [9] TSA subsequently affirmed this decision on appeal. *See* Pavlick Decl., Ex. I (4/24/06 letter from T. Miller to L. Klayman).

  [10] The term "*Glomar* response" refers to the subject of a FOIA request pertaining to a ship, the Hughes Glomar Explorer, at issue in *Phillippi v. Cent. Intelligence Agency*, 546 F.2d 1009 (D.C. Cir. 1976).

Plaintiff's arguments misunderstand the nature of the *Glomar* response. Insofar as TSA has construed Plaintiff's FOIA request as one seeking TSA watch list records relating to Plaintiff, TSA has refused to either confirm or deny the very <u>existence</u> of responsive records. Pavlick Decl. ¶¶ 7-8; Pavlick Decl., Ex. F (12/8/05 letter from C. Pavlick to L. Klayman). TSA has not asserted that it has withheld particular documents from Plaintiff, such that this Court could order TSA to submit the documents and a *Vaughn* index in camera. As the D.C. Circuit has explained, "[w]hen the Agency's position is that it can neither confirm nor deny the existence of the requested records, there are no relevant documents for the court to examine other than the affidavits which explain the Agency's refusal." *Phillippi v. Cent. Intelligence Agency*, 546 F.2d 1009, 1013 (D.C. Cir. 1976).

As Defendants correctly note, the D.C. Circuit has "agreed that an agency may refuse to confirm or deny the existence of records where to answer the FOIA inquiry would cause harm cognizable under an FOIA exemption." *Gardels*, 689 F.2d at 1103. Here, TSA asserts that FOIA Exemption 3, which provides that FOIA's disclosure requirements do not apply to matters "specifically exempted from disclosure by statute . . . provided that the statute (A) requires that matters be withheld from the public in such a manner as to leave no discretion on the issue, and (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld," 5 U.S.C. § 552(b)(3), applies to TSA's *Glomar* response based on 49 U.S.C. § 114(s) and implementing regulations at 49 C.F.R. §§ 1520.5 and 1520.15. Defs.' Mot. to Dismiss/Summ. J. at 17-20; Pavlick Decl. ¶¶ 19-20.

In order to assess TSA's Exemption 3 claim, the Court must first determine whether 49 U.S.C. § 114(s) is a "statute of exemption as contemplated by exemption 3" and then determine

whether "the withheld material satisf[ies] the criteria of the exemption statute." *Fitzgibbon v. Cent. Intelligence Agency*, 911 F.2d 755, 761 (D.C. Cir. 1990) (citing *Cent. Intelligence Agency v. Sims*, 471 U.S. 159, 167, 105 S. Ct. 1881, 85 L. Ed. 2d 173 (1985)). Pursuant to 49 U.S.C. § 114(s), TSA is authorized "[n]otwithstanding section 552 of title 5" to "prescribe regulations prohibiting the disclosure of information obtained in carrying out security . . . if [TSA] determines that disclosing the information would . . . (C) be detrimental to the security of transportation." 49 U.S.C. § 114(s). The D.C. Circuit has previously determined that an almost verbatim statute vesting the same authority in the Federal Aviation Administration prior to the establishment of TSA "unmistakably" demonstrated "that Congress intended to allow the FAA to withhold from public disclosure information falling within [its terms] whether or not FOIA is invoked." *Public Citizen v. Fed. Aviation Admin.*, 988 F.2d 186, 195 (D.C. Cir. 1993). Moreover, since the creation of TSA, at least one court has found "no dispute" that 49 U.S.C. § 114(s) falls within Exemption 3. *Gordon v. Fed. Bureau of Investigation*, 390 F. Supp. 2d 897, 900 (N.D. Cal. 2004).

The Court is also convinced that TSA's refusal to disclose information concerning TSA watch lists satisfies the criteria of 49 U.S.C. § 114(s) because TSA has determined that the disclosure of such information would be "detrimental to the security of transportation." 49 U.S.C. § 114(s). Specifically, 49 C.F.R. § 1520.5 provides that "[i]n accordance with 49 U.S.C. 114(s) [Sensitive Security Information (SSI)] is information obtained or developed in the conduct of security activities . . . the disclosure of which TSA has determined would . . . (C) Be detrimental to the security of transportation," and further provides that Security Directives issued by TSA constitute SSI. 49 C.F.R. §§ 1520.5(a) and 1520.5(b)(2). In addition, 49 C.F.R. §

38

1520.15 provides that "notwithstanding the Freedom of Information Act . . . SSI are not available for public inspection or copying, nor does TSA . . . release such records to persons without a need to know."  49 C.F.R. § 1520.15(a).  As Ms. Pavlick's Declaration explains, TSA watch lists are incorporated into Security Directives and Emergency Amendments issued to air carriers, and thus constitute SSI under 49 C.F.R. § 1520.5, which are exempt from disclosure under the FOIA.  Pavlick Decl. ¶ 21.

The Court concludes that TSA has thus demonstrated that its *Glomar* response to Plaintiff's FOIA request was entirely proper, insofar as TSA construed that request as one for records concerning Plaintiff's presence on TSA watch lists.  Moreover, Ms. Pavlick's Declaration provides an entirely reasonable justification for TSA's *Glomar* response – if TSA "were to confirm in one case that a particular individual was not on a watch list, but was constrained in another case merely to refuse to confirm or deny whether a second individual was on a watch list, the accumulation of these answers over time would tend to reveal SSI."  *Id.* Indeed, as one court has concluded in addressing a similar refusal by TSA to confirm whether plaintiffs' names appeared on any watch lists, "[r]equiring the government to reveal whether a particular person is on the watch lists would enable criminal organizations to circumvent the purpose of the watch lists by determining in advance which of their members may be questioned."  *Gordon v. Fed. Bureau of Investigation*, 388 F. Supp. 2d 1028, 1037 (N.D. Cal 2005); *cf. Bassiouni v. Cent. Intelligence Agency*, 392 F. 3d 244, 246 (7th Cir. 2004) (upholding CIA refusal to provide plaintiff with a list of documents mentioning him because, *inter alia*, "[w]hen a pattern of responses itself reveals classified information, the only way to keep secrets is to maintain silence uniformly.").

Defendants have thus established that TSA properly responded to Plaintiff's FOIA request by performing a reasonable, adequate, and good faith search for responsive records, and by appropriately refusing to confirm or deny the existence of responsive records pursuant to FOIA Exemption 3. As the Court has previously concluded that DOJ and DHS have likewise met the standard for summary judgment, the Court shall grant Defendants' motion for summary judgment as to Count IV of Plaintiff's Complaint.

B.    *Motion to Dismiss as to Counts I (Fourth Amendment), II (Right to Privacy), and III (First Amendment) of Plaintiff's Complaint*

In addition to seeking summary judgment on Plaintiff's FOIA claim, Defendants have moved, insofar as Counts I, II, and III of Plaintiff's Complaint are deemed pled against them, to dismiss those Counts under Federal Rule of Civil Procedure 12(b)(1) based on Plaintiff's lack of Article III standing.[11] Plaintiff's Opposition to Defendants' motion clarifies that Plaintiff intended to bring all four Counts of his Complaint against Defendants in their official capacities, *see* Pl.'s Opp'n. at 13-14, and argues that, as to Counts I, II, and III of his Complaint, Plaintiff has sufficiently alleged injury-in-fact, causation, and redressability, the three requirements for Article III standing.

As an Article III court, this Court's judicial power is limited to adjudicating actual "cases" and "controversies." *Allen v. Wright*, 468 U.S. 737, 750, 104 S. Ct. 3315, 82 L. Ed. 2d

---

[11] In addition to asserting that this Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331, Plaintiff's Complaint states that jurisdiction is proper pursuant to 28 U.S.C. § 1343, which grants the district courts original jurisdiction over civil actions "[t]o redress the deprivation, under color of any State law . . . of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens . . . ." 28 U.S.C. § 1343(a)(3). As Defendants correctly note, however, Plaintiff's suit is against federal officials and agencies who do not act "under color of any State law," and as a result 28 U.S.C. § 1343 is inapplicable. Defs.' Mot. to Dismiss/Summ. J. at 25 n. 7.

556 (1984). "In an attempt to give meaning to Article III's case-or-controversy requirement, the

courts have developed a series of principles termed 'justiciability doctrines,' among which are

standing[,] ripeness, mootness, and the political question doctrine." *Nat'l Treasury Employees*

*Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996) (citing *Allen*, 468 U.S. at 750, 104

S. Ct. 3315). These doctrines incorporate both the prudential elements, which "Congress is free

to override," *id.* (quoting *Fair Employment Council of Greater Wash., Inc. v. BMC Mktg. Corp.*,

28 F.3d 1268, 1278 (D.C. Cir.1994)) (internal quotations omitted), and "core component[s]"

which are "essential and unchanging part[s] of the case-or-controversy requirement of Article

III," *id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed.

2d 351 (1992) (internal quotations omitted)). In order to satisfy the constitutional standing

requirements, a plaintiff must establish that he or she has (1) suffered an injury in fact, which is

concrete and particularized and actual or imminent, not conjectural or hypothetical, (2) which is

fairly traceable to the challenged act, and (3) is likely to be redressed by a favorable decision.

*Id.*

Defendants correctly note that Plaintiff bears the burden of establishing the predicates for

standing; however, they incorrectly argue that these predicates must appear "affirmatively and

distinctly" in Plaintiff's Complaint. Defs.' Mot. to Dismiss/Summ. J. at 23. Such would be the

case on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6); however, on a

motion to dismiss under Rule 12(b)(1), the Court may consider matters beyond the pleadings

themselves including, specifically, affidavits submitted by the Plaintiff. *See Equal Employment*

*Opportunity Comm'n. v. St. Francis Xavier Parochial School*, 117 F.3d 621, 625 n.3 (D.C. Cir.

1997); *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987). As such, in reviewing

41

Defendants' motion to dismiss, the Court may consider both Plaintiff's Complaint and his Affidavit submitted in support of his Opposition.  Moreover, "[w]hile the complaint is to be construed liberally, the Court need not accept factual inferences drawn by plaintiff if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions." *Primax Recoveries, Inc. v. Lee*, 260 F. Supp. 2d 43, 47 (D.D.C. 2003) (citing *Nat'l Treasury Employees Union*, 101 F.3d at 1430; *see also American Farm Bureau v. Envtl. Prot. Agency*, 121 F. Supp.2d 84, 90 (D.D.C. 2000) (same).  The Court assesses Plaintiff's "specific allegations for their 'logical adequacy' and for 'quantum of proof,' *i.e.*, whether the specific alleged facts support inferences claimed by plaintiff, including an inference of causation." *Jud. Watch, Inc. v. United States Senate, et al.*, 432 F.3d 359, 360 (D.C. Cir. 2005) (citing *Haase*, 835 F.2d at 908, and *United Transp. Union v. ICC*, 891 F.2d 908, 913 n. 9 (D.C. Cir. 1989)).

Plaintiff's Complaint includes a variety of allegations, which can be divided into three categories: (1) Plaintiff's allegations that "Defendants unlawfully wiretapped Plaintiff's home" "in violation of the First and Fourth Amendment," Compl. ¶ 2(a)-(b); (2) Plaintiff's allegations concerning physical surveillance, including his allegation that "Defendants unlawfully placed a Radio Frequency Identification Tag ("RFIT") on Plaintiff's vehicle," Compl. ¶ 2(d); and (3) Plaintiff's allegations that "Defendants have improperly placed Plaintiff on a terrorist watch list," Compl. ¶ 2(c).  The Court shall address each category of allegations in turn in considering whether Plaintiff has met the requirements for Article III standing.

1.    *Plaintiff's Allegations Concerning Wiretapping*

Plaintiff's Complaint contains the following factual allegations concerning wiretapping: First, that during the Spring of 2002, while purchasing airline tickets from Southwest Airlines over the telephone, Plaintiff was asked whether he had any "comments, questions, or suggestions for Southwest Airlines, and responded that as a member of the traveling public, he would like "100 percent of everything that goes into the airplane, including cargo, to be fully screened." Tooley Aff. ¶ 4; Compl. ¶¶ 18-19. When asked why such a course of action would be necessary, Plaintiff responded that the traveling public "was less safe due to the potential that those who wish to harm American citizens could put a bomb on a plane." Tooley Aff. ¶ 5; Compl. ¶ 20. Second, that in the Fall of 2003, Plaintiff began to notice problematic phone connections, including "telltale intermittent clicking noises." Compl. ¶ 21. Third, that "Defendant Bush has admitted that, on numerous occasions since 2001, he ordered wiretaps and other domestic surveillance on American citizens," Compl. ¶ 38, and "the Department of Justice has recently acknowledged that Defendant Bush's 2001 eavesdropping order did not comply with the procedures of law that regulate domestic surveillance," *id.* ¶ 39. In addition, Plaintiff's Affidavit adds the allegation that Plaintiff's belief that his "communications are being monitored prevents [him] from freely communicating via telephone and by electronic means with [his] family, [his] attorneys, and [his] former colleagues." Tooley Aff. ¶ 21.

In addition to these limited factual allegations, Plaintiff's Complaint and Affidavit contain a bevy of allegations made "upon information and belief," including that Plaintiff's telephone problems are caused by illegal wiretaps, which were placed in response to the comments Plaintiff made while booking his flight with Southwest Airlines, Compl. ¶ 21; that "roving wiretaps" were placed on nine different cellular and landline phones belonging to

Plaintiff and his family (on whose behalf Plaintiff clearly cannot ground Article III standing), *id.*

¶ 22; and that Plaintiff "is one of the victims of Defendants' highly secret and illegal wiretapping

scheme," *id.* ¶ 47.  In addition, in his Opposition to Defendants' motion to dismiss, Plaintiff

describes the National Security Agency's Terrorist Surveillance Program as follows:

> It is undisputed that the Bush administration Defendants have admitted publicly to
> the following actions: (1) the Surveillance Program exists; (2) the Surveillance
> Program operates without warrants; and (3) the Surveillance Program targets
> communications where one party to the communication is outside the United
> States, and where the government has a "reasonable basis" from which to
> conclude that one party to the communication is a member of Al Qaeda, is
> affiliated with Al Qaeda, is a member of an organization affiliated with Al Qaeda,
> or is working in support of Al Qaeda.

Pl.'s Opp'n. at 16-17.

Attempting to separate Plaintiff's factual allegations from his speculation and inferences

reveals that Plaintiff has not established any of the required predicates for Article III standing

with respect to his claims regarding wiretapping.  While Defendants focus the majority of their

attention on Plaintiff's failure to demonstrate an injury in fact, Defs.' Mot. to Dismiss/Summ. J.

at 26-30, Plaintiff's Complaint bears equal infirmities with respect to causation and

redressability, all of which stem from the fact that Plaintiff has presented nothing to substantiate

his claim that his alleged wiretapping is in any way connected to the TSP.

Plaintiff's Complaint alleges that he has experienced problematic phone connections and

heard clicking noises on his phone lines, signs which he assumes indicate that wiretaps have been

placed on his phone lines.  Compl. ¶ 21.  As an initial matter, the Court notes that while Plaintiff

alleges "upon information and belief" that wiretaps were placed on his phone lines "in response

to" the comments he made while booking a Southwest Airlines flight, *id.*, Plaintiff did not begin

noticing problematic phone connections and clicking noises until the Fall of 2003, more than a year after Plaintiff's conversation with Southwest Airlines allegedly occurred, *id.* ¶¶ 18-21. Moreover, even if the Court accepts Plaintiff's conclusion that the phone problems and clicking noises are, in fact, caused by wiretapping, Plaintiff has not alleged any factual foundation for his speculation that wiretaps were placed on his phone as a result of his conversation with Southwest Airlines. Nor does Plaintiff's Complaint actually allege that an agent of the federal government placed wiretaps on Plaintiff's phone. Most significantly, Plaintiff has offered no basis – other than his own subjective belief – for his unsubstantiated conclusion that he has been the subject of warrantless wiretaps as part of the TSP. Instead, Plaintiff posits simply that, because President "Bush has admitted that, on numerous occasions since 2001, he ordered wiretaps and other domestic surveillance on American citizens," *id.* ¶ 38, and the Department of Justice has "acknowledged that Defendant Bush's 2001 eavesdropping order did not comply with the procedures of law that regulate domestic surveillance," *id.* ¶ 41, Plaintiff's purported wiretapping must be part of the TSP. To the contrary, however, it is altogether possible that rather than being a subject of the TSP, Plaintiff has been the subject of entirely lawful wiretaps placed by state or local law enforcement agencies.[12] As a result, there is an insurmountable disconnect between the

_____

[12] Plaintiff's Complaint alleges a "strong presumption or inference existing [sic] that [Plaintiff] was wiretapped as part of the NSA's illegal activities based on evidence which includes . . . (a) His inclusion on at least one terrorist watchlist . . . (b) Press sources have confirmed that people on a terrorist watchlist are likely subject to NSA's illegal surveillance activities; (c) He has constantly heard intermittent clicking noises on his phone, a classic sign of wiretapping; (d) He is in possession of evidence of government surveillance; and (e) President Bush has admitted the existence of the NSA wiretapping activities . . . and reports have confirmed that the activities include both international and domestic calls." The Court will address Plaintiff's conclusion that he is included on a TSA watch list below, but notes at this juncture that Plaintiff's claim regarding "Press sources" is nothing more than an opinion, albeit from a source other than Plaintiff himself, and that Plaintiff's unspecified "evidence of

existence of the TSP and Plaintiff's conclusion that he has been part of it.

Article III standing requires that a Plaintiff allege an injury in fact that is "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotes and citations omitted). Moreover, for Article III standing to be proper, Plaintiff's injury must be one that "fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the Court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42, 96 S. Ct. 1917, 48 L. Ed. 2d 450 (1976). Here, Plaintiff alleges injury to his First and Fourth Amendment rights, his Constitutional right to privacy, Compl. ¶¶ 49-76, and more specifically alleges that his belief "that his communications are being monitored prevents [him] from freely communicating via telephone and by electronic means with [his] family, [his] attorneys, and [his] former colleagues," Tooley Aff. ¶ 21.[13] Plaintiff's Opposition to Defendant's motion to dismiss further

---

government surveillance" is entirely hypothetical without further description.

[13] The Court is aware that at least one court has found that plaintiffs had standing to challenge the TSP. *See Amer. Civil Liberties Union v. Nat'l Sec. Agency*, 438 F. Supp. 2d 754 (E.D. Mich. 2006), *appeals docketed*, No. 06-2095 (6th Cir. Aug. 17, 2006) and No. 06-2140 (6th Cir. Aug. 30, 2006). *ACLU v. NSA* is readily distinguishable from the instant case, however, because the plaintiffs in *ACLU v. NSA* are a group of persons and organizations, including journalists, lawyers, and scholars, *id.* at 758, who "contend that the TSP has interfered with their ability to carry out their professional responsibilities in a variety of ways, including that the TSP has had a significant impact on their ability to talk with sources, locate witnesses, conduct scholarship, engage in advocacy and communicate with persons who are outside of the United States, including in the Middle East and in Asia." *Id.* at 767 (emphasis added). Furthermore, the *ACLU v. NSA* plaintiffs submitted declarations indicating that they "must communicate with individuals abroad whom the United States government believes to be terrorist suspects or to be associated with terrorist organizations." *Id.* (emphasis added). The *ACLU v. NSA* plaintiffs thus fit squarely within the category of individuals who, based on Plaintiff's allegations regarding the nature of the TSP, would be likely to be subjects of the TSP. *See* Pl.'s Opp'n. at 16-17. In contrast, Plaintiff Tooley does not allege that he has ever communicated with individuals in the Middle East or Asia or that he has communicated with individuals whom the United States

claims that Plaintiff's First Amendment Rights have been "chilled" and that Plaintiff has been

"gagged" by the alleged wiretaps and physical surveillance. Pl.'s Opp'n. at 21-22.

Even assuming, *arguendo*, that such injuries are sufficiently concrete and particularized

to ground Article III standing, they nevertheless remain entirely hypothetical and conjectural

because Plaintiff has not even provided any factual basis for his conclusion that he has been the

subject of <u>illegal</u> wiretaps. The Court notes, of course, that if Plaintiff has been the subject of

lawful wiretaps, he has suffered no injury to his First and Fourth Amendment rights or his

Constitutional right to privacy. Furthermore, as Plaintiff has offered absolutely no factual nexus

between the existence of the TSP and his claims that his phones have been wiretapped, he has

failed to demonstrate that he has suffered an injury fairly traceable to Defendants. Finally, as

Plaintiff has not offered evidence of a causal connection between Plaintiff's alleged injuries and

Defendants, it is unclear that injunctive relief against Defendants would redress Plaintiff's

alleged injuries. Such injunctive relief would, of course, be entirely ineffective if, in fact,

Plaintiff is the subject of wiretaps placed by someone other than federal officials or if there are

---

government would have a "reasonable basis" to conclude were affiliated with Al Qaeda. Indeed, the only international communications mentioned in Plaintiff's Complaint are phone calls to and from family members in France, made while Plaintiff was visiting his family's home in Lincoln, Nebraska. Compl. ¶¶ 22, 46. As a result, Plaintiff's allegations that he has been a subject of the TSP do not square with his own description of the program and his allegations therefore lack the requisite factual predicate to ground Article III standing.

Moreover, the Court notes that the plaintiffs in *ACLU v. NSA* alleged that the TSP violates their free speech and associational rights under the First Amendment to the United States Constitution; their privacy rights under the Fourth Amendment to the United States Constitution; the principle of Separation of Powers; and the statutory limitations placed on interceptions by Congress in the Foreign Intelligence Surveillance Act. *ACLU v. NSA*, 438 F. Supp. 2d at 758. In the instant case, however, the Court is not presented with any of these questions and, as such, neither draws conclusions nor opines in any way about the TSP itself, beyond adopting for the purposes of this opinion the parties' characterizations of the TSP.

actually no wiretaps. As a result, the Court concludes that Plaintiff lacks Article III standing with respect to his allegations concerning wiretapping.

2.    *Plaintiff's Allegations Concerning Physical Surveillance*

Plaintiff's Complaint contains a sole allegation regarding physical surveillance – his claim that "[u]pon information and belief, both [his] vehicle and his wife's vehicle have been illegally subjected to permanent Radio Frequency Identification Tags that monitor their vehicle movements." Compl. ¶ 23. In addition, in his Affidavit Plaintiff claims that in March 2005, during the week preceding and the week of a visit by President Bush to Louisville, Kentucky, "an officer in a Ford Crown Victoria sat out in front of [Plaintiff's] home for approximately six (6) hours a day," Tooley Aff. ¶ 19, and that in March 2006, Plaintiff was subjected to physical monitoring during a trip to Fort Worth, Texas for his brother's wedding, *id.* ¶ 16. Plaintiff alleges no facts in support of his claim that Radio Frequency Identification Tags have been placed on his car, nor does Plaintiff offer any factual basis for his allegation that an unidentified "officer" sat in front of his house "as a threat of recrimination or persecution of political speech that serves as a direct injury to the exercise of [Plaintiff's] First Amendment Free Speech rights." *Id.* ¶ 19. Indeed, even Plaintiff's conclusion that the individual sitting in front of his house was an "officer" of some sort appears to be based solely on the make of car that the individual allegedly sat in. When Plaintiff's Complaint is stripped of speculation and inferences, which are unsupported by Plaintiff's factual allegations, it is clear Plaintiff has failed to demonstrate a sufficiently concrete and particularized injury in fact stemming from his allegations concerning physical surveillance.

Moreover, Plaintiff has entirely failed to demonstrate any causal connection between his

48

alleged physical surveillance and Defendants.  Significantly, Plaintiff does not claim that a

federal agent was responsible for any of the alleged physical surveillance.  Furthermore, the

physical surveillance Plaintiff describes bears absolutely no relationship to the TSP, which

Plaintiff himself has described as involving warrantless wiretaps.  Pl.'s Opp'n. at 16-17.  Plaintiff

has thus failed to provide the Court with evidence of either causation or redressability, and as a

result has not carried his burden of establishing Article III standing with respect to his allegations

of physical surveillance.

3.    *Plaintiff's Allegations Concerning Watch Lists*

As an initial matter, the Court notes that Plaintiff incorrectly asserts that TSA's refusal to

confirm or deny the existence of records relating to Plaintiff's presence on TSA watch lists

constitutes a "tacit admission" that Plaintiff is on at least one such watch list.  Compl. ¶¶ 32-34.

As discussed above, TSA's *Glomar* response relates only to its desire to protect the integrity of

the watch lists, and bears no relation to whether or not Plaintiff is actually on any watch lists.

Pavlick Decl. ¶ 21.  Notwithstanding this incorrect assertion, Plaintiff's Complaint and Affidavit

establish Article III standing with respect to his claim that he was improperly placed on one or

more TSA watch list.  Plaintiff's Complaint alleges that following his conversation with

Southwest Airlines in the Spring of 2002, he has been "improperly detained and subject to a strict

search without any probable cause."  Compl. ¶¶ 24-25.  Plaintiff's Affidavit provides further

details regarding these detentions and strict searches, which he claims occurred every time he

traveled prior to filing this suit.  Tooley Aff. ¶ 15.  Specifically, Plaintiff alleges that in July

2004, he was subjected to a "degrading and unreasonable search" at Omaha's Eppley Airfield in

which his name was broadcast over the PA system as someone who needed further screening,

and a TSA officer thereafter pulled him aside and, in full view of Plaintiff's fellow passengers, asked Plaintiff to expose the area above his groin and subjected Plaintiff to a backhanded pat-down. *Id.* ¶ 14.

Plaintiff's assertion that he has already been subject to detentions and strict searches constitutes a sufficiently concrete and particularized injury in fact, which is actual as opposed to conjectural.  Moreover, insofar as Plaintiff alleges he was improperly placed on terrorist watch lists, those watch lists are fairly traceable to Defendants.  Defendants argue that Plaintiff's allegations concerning detentions and searches are overly speculative in light of the fact that all Americans are subject to search when they travel by air, Defs.' Mot. to Dismiss/Summ. J. at 32-33; however, at the motion to dismiss stage, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan*, 504 U.S. at 560, 112 S. Ct. 2130 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990)).  As such, Plaintiff has sufficiently pled an injury that is fairly traceable to Defendants, and which may be redressed by the relief Plaintiff seeks – an order requiring "Defendants to remove Plaintiff's name from any and all watch lists that may indicate Plaintiff is associated with any terrorist activities or organizations."  Compl. at 15.

However, although Plaintiff has established Article III standing with respect to his claims concerning watch lists, this Court cannot review Plaintiff's claims and issue the relief he seeks because it lacks the requisite subject matter jurisdiction.  As discussed above, TSA watch lists are incorporated into Security Directives issued by TSA pursuant to 49 U.S.C. § 114(l)(2)(A), *see supra* at 39; Pavlick Decl. ¶ 21, and Congress has vested exclusive jurisdiction to review such

directives in the Court of Appeals.  48 U.S.C. §§ 46110(a) and 46110(c).  As two courts have

previously found when faced with this very question, insofar as Security Directives establish

terrorist watch lists, only the Court of Appeals has jurisdiction to "amend, modify, or set aside"

such Directives.  48 U.S.C. § 46110(c); *Ibrahim v. Dep't of Homeland Sec.*, No. C. 06-00545

WHA, 2006 WL 2374645 at *5-8 (N.D. Cal. Aug. 16, 2006); *Green v. Transp. Sec. Admin.*, 351

F. Supp. 2d 1119, 1125 (W.D. Wash. 2005); *see also Gilmore v. Gonzales*, 435 F.3d 1125, 1130

(9th Cir. 2006), *petition for cert. filed*, 75 U.S.L.W. 3074 (Aug. 4, 2006) (affirming District

Court determination that it lacked jurisdiction to hear due process challenge to identification

policy incorporated into Security Directive).  This Court is therefore constrained to find that it

lacks subject matter jurisdiction to review Plaintiff's claims regarding his inclusion on TSA

watch lists.

## IV: CONCLUSION

For the reasons set forth above, the Court shall grant Defendants' motion for summary

judgment as to Count IV of Plaintiff's Complaint.  In addition, the Court shall grant Defendants'

motion to dismiss Counts I, II, and III of Plaintiff's Complaint because Plaintiff lacks Article III

standing to pursue his claims concerning wiretapping and physical surveillance against the

Defendants, and because this Court lacks subject matter jurisdiction to review Plaintiff's claims

regarding TSA watch lists.  An appropriate Order accompanies this Memorandum Opinion.

Date:    December 21, 2006

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge

51